*In re* NEWMAN

Docket Nos. 128168, 128316. Submitted January 17, 1991, at Lansing. Decided May 6, 1991, at 10:20 A.M. Leave to appeal sought.

The Department of Social Services petitioned the Saginaw County Probate Court, Juvenile Division, for an order terminating Wendy and Willard Newman's parental rights to five of their minor children, alleging, in part, inadequate or improper care and supervision of the children, dirty and unsanitary conditions in the home, and unsatisfactory compliance by Willard Newman with court-ordered counseling. The court, Faye M. Harrison, J., entered an order terminating the respondents' parental rights. The respondents appealed separately, alleging that the decision was not supported by clear and convincing evidence. The appeals were consolidated.

The Court of Appeals *held:*

The petitioner did not prove by clear and convincing evidence that the conditions alleged in the petition had not and would not be remedied within a reasonable time or that the respondents failed to provide proper care and custody of their children, and there is no reasonable expectation that the respondents would be able to provide proper care and custody within a reasonable time.

1. The court erred in finding the conditions in the home to be a basis for terminating the respondents' parental rights because they were not given a full and fair opportunity to maintain the home. The evidence indicates that the respondents need direct instruction on how to clean and maintain their home and did not receive consistent assistance from the DSS agent assigned to help remedy the problem. It was not shown that the respondents could not rectify the problem with consistent assistance.

2. The conclusion that the respondents failed to adequately supervise their children was premature. They were not given the chance to demonstrate that they could properly supervise their children without the presence of their son Claire, who was the source of most of the supervision problems and who even professionals, teachers, and foster care providers could not control. The respondents should have been given a fair opportu-

nity to demonstrate their abilities as parents without the added or insurmountable burden of trying to control Claire.

3. The trial court faulted the respondents for the alleged sexual abuse of two of their daughters by an uncle, but gave no recognition to the important fact that such incidents can occur even in the best of homes, or to the action taken by the respondents to prevent it from happening again.

4. The evidence regarding Mr. Newman's alleged failure to complete counseling was incomplete.

5. The order terminating respondents' parental rights must be reversed and the case remanded for reconsideration after the respondents have been given an opportunity to demonstrate their ability as parents without the distractions caused by Claire and after they have been given further direct instruction regarding personal hygiene and household cleanliness by a DSS agent.

Reversed and remanded.

*Michael D. Thomas,* Prosecuting Attorney, and *Kay F. Pearson,* Chief Appellate Attorney, for the Department of Social Services.

*F. H. Martin,* for Wendy Newman.

*Keith L. Skutt,* for Willard Newman.

*Daryl L. Orr,* for the minor children.

Before: NEFF, P.J., and SHEPHERD and McDON-ALD, JJ.

SHEPHERD, J. Respondents Willard and Wendy Newman brought separate appeals as of right from an April 12, 1990, order effectuating the Saginaw County Probate Court, Juvenile Division's earlier order terminating respondents' parental rights to their five minor children who, at the time, ranged in age from three to twelve. The appeals were consolidated. After a thorough review of the record in this matter, we reverse.

Respondents' family first came to the attention

of the Department of Social Services in September 1978 because of allegations there were dirty, unsafe, and unsanitary conditions in the home. There were several additional contacts with the DSS over the next few years, and the children were placed in foster care for about eight months in 1983 because of inadequate housing conditions. During that eight-month period, respondents complied with the terms and objectives of a parent/agency agreement and were found, as on prior occasions, to be very cooperative. They moved to provide more adequate housing, made efforts to clean up the house, submitted to psychological evaluations, and visited their children regularly.

Subsequent encounters with the DSS between 1985 and 1987 revealed some problems with the children's recurrent contraction of head lice, from sources such as contacts at school, the personal hygiene of all the family members, and the dirty conditions at home, but each time the DSS caseworker investigating the family found no basis for removal of the children or other DSS intervention.

In January 1988, however, the DSS petitioned to have the children made temporary wards of the court on the basis of stipulated allegations that (1) the home had been heated with a kitchen oven and small portable heater which had no protective facing; (2) several rooms in the home were cluttered with dirty clothing, garbage, dirty pots and pans, and debris; and (3) the children wore dirty clothing, had strong body odor, were hungry, and the three girls had head lice. In March 1988, the children were made temporary wards of the court, and respondents were ordered to attend parenting classes, submit to psychological evaluations and attend counseling if those evaluations revealed it was necessary, and maintain a clean household.

In October 1989, the DSS petitioned for termina-

tion of respondents' parental rights pursuant to MCL 712A.19b(3)(c)(i), (d); MSA 27.3178(598.19b)(3) (c)(i), (d), setting forth nineteen separate allegations ranging from inadequate or improper care and supervision of the children during the respondents' visits to dirty, unsanitary conditions in the home and unsatisfactory compliance with court-ordered counseling by respondent Willard Newman. It should be noted here that respondents had another child, Melissa, in March 1989, but she has remained in respondents' care and custody without any intervention by the DSS.

After a lengthy hearing, the probate court terminated respondents' parental rights to the five children but suspended its order for ninety days contingent upon respondents' compliance with twenty conditions set forth in a January 17, 1990, order. On March 14, 1990, counsel for the children moved for the termination of respondents' parental rights, claiming they had not complied with several of the conditions imposed by the court in January. After a hearing on the motion, respondents' parental rights were terminated.

Though respondent Willard Newman asserts on appeal that the probate court applied an inappropriate and insurmountable burden of proof on respondents, the primary issue here, as phrased by respondent Wendy Newman, is whether the probate court's decision to terminate respondents' parental rights was supported by clear and convincing evidence. We agree with respondents that it was not.

Respondents' parental rights were terminated pursuant to MCL 712A.19b(3)(c)(i), (d); MSA 27.3178(598.19b)(3)(c)(i), (d), which provides as follows:

(3) The court may terminate the parental rights

of a parent to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

\* \* \*

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(i) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the age of the child.

\* \* \*

(d) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the age of the child.

On appeal from termination of parental rights proceedings, we review the probate court's findings under a clearly erroneous standard. MCR 5.974(I); *In re Miller,* 182 Mich App 70, 81; 451 NW2d 576 (1990). A finding is clearly erroneous where, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989); *In re Cornet,* 422 Mich 274, 278; 373 NW2d 536 (1985). Consistent with this standard, deference must be accorded to the probate court's assessment of the credibility of the witnesses before it. *In re Miller.*

We first address the allegation that respondents have repeatedly failed to maintain their home so as to make it fit for habitation by the children. There is no question that respondents have a problem in this regard. Their home has repeatedly

been found to be cluttered and dirty. However, it is also readily apparent from the testimony that respondents, particularly Wendy Newman because of her limited intellectual capacity, need hands-on instruction, most probably repeatedly, on how to clean and maintain the home. The homemaker assigned to this family testified that she purchased cleaning supplies for respondents, but quite some time ago stopped going into the house because it was so dirty. This was the person who was supposed to help respondents remedy this problem, but she refused. How then can we say there is no reasonable likelihood that the conditions in the home would not be rectified within a reasonable time when the one person who could have helped respondents remedy the conditions refused to do so?

The blame cannot be placed entirely on the DSS in this regard, but easily more could have been done for respondents, particularly in light of the fact that they demonstrated over the course of time an ability and willingness to learn. Quite telling with respect to this issue are the periodic reports by the caseworker assigned to this family, Allen Satkowiak. In his May 1988 report, he stated that respondents had been very cooperative, had entered into parenting classes, and had maintained visitation. He further noted that respondents had improved the home, cleaned it up and kept it clean, remedied all the conditions listed in the January 1988 petition, and kept the home appropriately furnished and stocked with food. Satkowiak's June and September 1988 reports indicated that all the objectives in the parent/agency agreement previously entered into had been met. The October 1988 report stated that Wendy Newman had maintained an adequate and

appropriate physical dwelling and kept it adequately clean and stocked with food.

In February 1988 Satkowiak reported that unannounced visits to the home revealed it to be kept minimally clean, though he had to remind Mrs. Newman to keep the kitchen area clean and more orderly. The safety concerns mentioned in the January 1988 petition had been addressed and the only concerns at this point were respondents' alleged failure to make sufficient progress in counseling and whether they were administering appropriate care to the children during visits. A May 1989 report indicated that visitation in the home had been curtailed, because some of the children had contracted scabies, and Satkowiak was concerned about respondents not keeping the home clean. Yet, the July 1989 report revealed that despite the addition of a baby, Satkowiak found no problems regarding respondents' care of her.

We find it significant that while the DSS claimed the home was too filthy for the five children to live in, the DSS apparently saw no problem with allowing respondents' young baby to remain there. If the conditions in the home posed a threat to anyone, it would be the infant. Yet, the DSS has never petitioned for her removal and wardship. Nor has it been shown that the children's contraction of lice and scabies was directly attributable to respondents' failure to keep the home clean, as opposed to outside sources. If these parasites are spread through contact in the respondents' home, respondents must be shown how to clean affected areas or furniture.

We believe the trial court did err in finding the conditions in the home to be a basis for terminating respondents' parental rights because respondents were not given a full and fair opportunity to maintain the home. They need help. It was not

shown that after being given consistent assistance they still did not rectify the conditions.

The second basis for terminating respondents' parental rights was their alleged failure to adequately supervise their children, resulting in the children returning from visits with scrapes and bruises. Significantly, there is little dispute between the parties that these minor injuries were almost always attributable to encounters with respondents' son Claire. Claire is a child with whom respondents have had a great deal of trouble behaviorally. Yet even professionals, teachers, and a foster care provider could not control him. He was originally placed in a foster home with his brother Phillip, but after ten days the foster care provider insisted that he be removed.

Respondents did notify the DSS of the problems they were having with Claire during weekend visitations with all the children, but the DSS's solution was not to try visitation without Claire, but rather to restrict it to an hour a week at the DSS offices. Indeed, caseworker Allen Satkowiak testified that even if respondents had asked to try visitation in the home without Claire, he would have refused because respondents needed to learn how to handle the entire family. Given the professionals' inability to handle this child, even in structured settings, we find it incredible that respondents were deemed unfit because of their inability to adequately control him. Respondents were not given even a fighting chance to demonstrate whether they could properly supervise their children without Claire being present. Before they were deemed unfit parents, they should have been given a fair opportunity to demonstrate their parenting abilities without the added, perhaps insurmountable, burden of trying to control this child while at the same time supervising four other

children and an infant in the home setting. In sum, the conclusion that respondents failed to adequately supervise their children was, at best, premature.

Petitioner readily acknowledges the love and bonding that has always existed between the members of respondents' family. There is also little question that respondents have consistently addressed the medical needs of their children, with a few minor exceptions, as testified to by their pediatrician. Moreover, there was never any allegation that respondents' children were not adequately fed or clothed, only that they were often dirty. And, even though two of respondents' daughters may have been exposed to some sexual abuse by an uncle, once respondents learned of the incidents, they did not allow any further contact with this uncle. The trial court faulted respondents for allowing this to happen in the first place, deeming it evidence of respondents' failure to properly supervise and protect their children, but gave no recognition to the important fact that such incidents can occur even in the best of homes or to the action taken by respondents in an effort to prevent it from ever happening again.

In regard to Mr. Newman's alleged failure to complete counseling, we note that while he claimed he had seen a VA counselor who told him he needed no further counseling, next to nothing was done to verify Mr. Newman's claim. Allen Satkowiak called the VA and asked for the counselor, but did nothing further when he did not receive a return phone call. We also note that on April 19, 1990, Mr. Newman was undergoing counseling, but there is nothing on the record concerning the progress, if any, he had made. Mrs. Newman had attended parenting classes as well as

counseling, the latter of which was ongoing as of April 1990.

Respondents are less than ideal parents. But this is not a perfect world. Respondents need help, not in learning how to love their children, but in learning how to maintain hygiene in the home. Many of their shortcomings stem from a lack of education and, in Mrs. Newman's case, hampered intellectual capacity, because she is mildly retarded. Certainly, these shortcomings are not attributable to a lack of love for the children. While respondents must improve their parenting skills, we cannot say, even accepting as true the allegations in the January 1988 petition, that petitioner has proven by clear and convincing evidence that the conditions therein had not and would not be remedied within a reasonable time or that respondents failed to provide proper care and custody for their children and there is no reasonable expectation respondents would be able to provide proper care and custody within a reasonable time. We find that while there was some evidence to support the probate court's findings, it was not clear and convincing, and an error was made in this case.

We therefore reverse the order terminating respondents' parental rights and remand this matter for reconsideration after respondents have been given an opportunity to demonstrate their ability to parent without the distractions caused by Claire and after they have been given further hands-on instruction regarding personal hygiene and household cleanliness by a person within DSS who is prepared to face the problem rather than run away from it. It may be that the children could be slowly reintegrated into the home even if Claire needs to remain in foster care (with parental and sibling visitation) for an extended period. Regardless, the problems posed by Claire must be ad-

dressed. We do not consider it appropriate to destroy a family's relationship with five children if the major problem appears to be the parents' inability to cope with one of them—particularly where even the professionals and foster care personnel could not cope with him.

This case raises the spectre of two serious problems facing all participants in parental termination cases—the trial and appellate courts and DSS. First, there is the risk that in some cases it would be easier from a bureaucratic perspective to terminate parental rights, making the children eligible for adoption, than to make an extra effort to hold the family together. This comes close to being such a case. Secondly, we tend to lose sight of the fact that it may be no solution at all to terminate parental rights where some hope of keeping the family together exists. Older children are not normally adoptable, and we may be creating five rootless people who at age eighteen will be thrown into society without the family support system that may very well keep them away from crime and homelessness.

Reversed and remanded. We do not retain jurisdiction.