*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re D. M. WEST, Minor.

UNPUBLISHED
September 1, 2022

No. 359043
Wayne Circuit Court
Family Division
LC No. 2016-523267-NA

Before: RIORDAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

In this case involving termination of parental rights, father appeals as of right the trial court's order terminating his parental rights to his minor child, DMW, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody when financially able to do so), and (j) (reasonable likelihood that child will be harmed if returned to parent). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

On October 17, 2018, a petition was filed regarding DMW, in which petitioner sought to remove the child from the home, terminate the parental rights of mother,[1] make DMW a temporary court ward, and require father to comply with a treatment plan. The initial petition did not seek termination of father's parental rights. Mother's parental rights to another child had been terminated in June 6, 2018,[2] and the instant petition was assigned the same case number as the previous termination proceedings.

The petition regarding DMW alleged in relevant part with respect to mother that she had untreated mental health issues, that she was not compliant with her required medication, that she did not make any attempt to care for or interact with DMW while in the hospital after he was born,

---

[1] Mother is not a party to this appeal and will only be discussed as necessary to provide factual context.

[2] Matters pertaining to the other child and previous termination are not at issue in the instant appeal.

that Child Protective Services (CPS) had been unable to locate mother since she was discharged from the hospital, and that mother had not visited DMW or assisted in his care since birth. Regarding father, the petition alleged that it was contrary to DMW's welfare to remain in father's care and custody because father did not have housing independent of mother, did not have any other suitable housing options, was currently on probation, and had a history of consistent and frequent contacts with the criminal justice system dating back to 1981 that presented a substantial risk of harm to DMW.

At the October 19, 2018 preliminary hearing, father was present at the hearing and indicated that he was the legal and biological father of DMW. Father had signed an affidavit of parentage. CPS investigator Joselynn Sauls was the petitioner in this matter, and she testified consistently with the allegations in the petition. Sauls also testified that father's address was the same as the address for mother, as well as mother's sister and mother. The petition was authorized, DMW was placed with the Department of Health and Human Services (DHHS) for care and supervision, and father was given supervised parenting time.

At a hearing held on December 6, 2018, the trial court assumed jurisdiction over DMW with respect to father based on father's plea of admission to certain allegations in the petition. Father specifically admitted that he did not currently have suitable housing, that he had an extensive criminal history, and that he was currently on probation for making a fraudulent real estate conveyance. Father indicated that he had completed parenting classes and was working on obtaining adequate housing. Father also explained that he currently lived with mother's daughter because mother "left her house in the care of her daughter." Father acknowledged that he did not have his own independent housing, but he explained that he was looking for housing and was "on disability." Father's plea was accepted.

The disposition was conducted during the same proceeding. The trial court ordered father to complete and benefit from services that included parenting classes, maintain suitable housing and a legal source of income, maintain contact with the DHHS worker, and attend all court hearings. Although the DHHS requested an order requiring father to participate in individual therapy, the referee declined to recommend that this requirement be included in the order but indicated that the DHHS could renew this request later "if it seems to be an issue." The referee stated that housing was the "biggest barrier" to reuniting the child with father.[3]

At the dispositional review hearing held on March 21, 2019, father testified that he received $771 per month in disability based on depression. According to father, he was diagnosed with depression in 1986 or 1996 and he was not currently being treated for his depression. Father also testified that he had obtained housing, that he was paying rent, and that DMW could live there. Father claimed that foster-care case manager Loretta Wiggins had already had an opportunity to conduct a home assessment on March 20, 2019. Additionally, father testified that he had completed parenting classes and that he only missed parenting time visits if "they either canceled

---

[3] Following a bench trial during the same hearing, the trial court terminated mother's parental rights to DMW based on mother's essential abandonment of the child, lack of contact with the child since birth, unresolved mental health issues, and previous termination of her parental rights to another child. Mother's whereabouts were still unknown, and she was not present at the hearing.

or for some reason that they decided not to have the visit." Father maintained that he was not at fault for missing any visits.

Wiggins testified that she would investigate father's disability income, which would qualify as a legal source of income. Wiggins further testified that three of father's visits with DMW had been cancelled because the agency was closed, that father had been offered make-up visits, that he had previously received bus passes, and that father currently had his own source of transportation. Wiggins acknowledged that father had completed a parenting class. However, she indicated that father's treatment plan should include Infant Mental Health because father had difficulty soothing DMW during visits and needed more one-on-one assistance with developing parenting skills. Wiggins also requested that father complete a psychiatric evaluation and individual therapy based on his psychological diagnosis. Wiggins opined that father's visits with the child were appropriate but that there did not appear to be a bond between father and DMW. She believed father should have more parenting time to allow for that bond to develop.

With respect to housing, Wiggins testified that she went to father's home but one of the household members did not cooperate with the interview process. Wiggins assessed the home, and it was physically satisfactory, but the home assessment could not be fully completed without investigating the household members. Father had not provided any utility bills in his name, but he provided documentation that father was paying rent. Wiggins stated that father had now complied with everything that had been asked of him but explained, however, that she had only received the information about father's income and housing at the hearing despite having asked for it multiple times before. Wiggins had ongoing concerns about father's parenting ability.

Counsel for petitioner requested that the court order father to undergo a psychiatric evaluation, because of his admitted disability and currently untreated mental health issues, so as to resolve this issue and ensure the safety of the child. The trial court ordered Infant Mental Health services, as well as a psychiatric evaluation and any recommended follow-up. The referee stated on the record at the hearing, "I'm not gonna order the individual therapy at this time because we don't even know if he needs the individual therapy. But we just want to make sure that whatever mental-health issues there are or if they were in the past that they're in check." Father stated on the record that his mental health was not an issue and should not prevent the return of his child. Father also stated that he understood the order to undergo a psychiatric evaluation and complete any recommended follow-up.

At the next hearing on May 17, 2019, Wiggins testified that she did not know where father was currently living. Father had told her that his current home was not going to work and that he was looking for new housing. Father did not miss any parenting time visits, but it had been reported that father still was unable to sooth DMW. Father left a visit early and was often frustrated during visits. At the hearing, Wiggins requested a parenting coach for father. When father's counsel asked Wiggins what was preventing the return of DMW to father, Wiggins explained that she did not know where father currently lived and that a child cannot be returned to an unknown home. Wiggins explained further that she did not yet have any information about father's current mental health status. Father testified that he had recently completed two psychiatric evaluations and signed appropriate releases. He also claimed to have just purchased a house that would be ready in about five days. The trial court ordered a parenting coach.

-3-

As the case progressed over the course of the next two years, father failed to obtain suitable housing that could be approved by the foster-care worker and father continued to delay in actually undergoing a psychiatric evaluation. It became evident that father had only completed a psychological evaluation and had not completed a psychiatric evaluation. The psychological evaluation recommended a psychiatric evaluation. Father informed the referee on the record that he did not need Infant Mental Health or parent partner services. The trial court ordered a psychiatric evaluation and Infant Mental Health services as it had previously. The trial court also ordered a parent partner.

With respect to housing, father claimed that his house was not suitable for DMW and that he was fixing it up. He asked about having another home assessed but did not provide any information. Foster-care case manager Donna Jones provided father with an application for low-income housing. Father told a foster-care worker that he wanted DMW to go live with father's sister in Tennessee, but father did not provide any contact information for his sister. There were times where father's whereabouts were unknown or he failed to return phone calls. Finally, father allowed foster-care case manager Amy Strick to assess his home at some point in August 2020. However, the home did not have any smoke detectors or furniture, and father had not provided any documentation that the utilities were in his name or that he had an actual possessory interest. Strick testified that it did not look like anybody lived there. Father subsequently claimed not to live in this home and provided more homes for Strick to assess without providing a permanent address where he actually resided.

On April 19, 2021, a supplemental petition was filed seeking termination of father's parental rights to DMW pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). The petition alleged that father had failed to comply with his court-ordered services and treatment plan that included maintaining suitable housing, maintaining a legal source of income, completing parenting classes, completing psychological and psychiatric evaluations, maintaining contact with foster-care workers, and attending all court hearings.

The trial was held on September 22, 2021. Father was present. Father's August 2021 psychiatric evaluation report was admitted as an exhibit. Strick testified that DMW had come into care because mother had abandoned him, father did not have suitable housing, and father had an extensive criminal history. Mother's parental rights were terminated, and father was ordered to comply with a treatment plan that consisted of maintaining safe and suitable housing, maintaining a legal source of income, parenting classes, completing psychological and psychiatric evaluations, maintaining contact with foster-care workers, and attending all court hearings. Father had been referred for all court ordered services multiple times.

Father completed a parenting class in 2018 but did not show that he benefitted from it. Strick explained that father's visits with DMW after this class were still not going well, that a subsequent psychological evaluation recommended that he needed further parental support, and that he scored poorly on the parenting evaluation in that psychological assessment. He was referred for additional parenting classes multiple times, but he did not complete subsequent parenting classes.

Strick also testified about father's housing situation. She assessed a home for father in August 2020, but it was not suitable because it did not have furniture or smoke detectors and there

-4-

was no documentation of utility bills. Other homes that father requested to have assessed were also not approved. Recently, on September 7, father had asked Strick to assess the home of a friend with whom he was planning to move in. Strick stated that the requisite background checks were being conducted regarding this home.

Strick stated that father had also not provided documentation of a legal source of income. Although father had indicated that he received Social Security disability income, he did not provide Strick with documentary proof despite her requests. Father had only provided documentation of his Social Security income to a previous worker in 2019. Father was also sporadic in maintaining contact with Strick.

According to Strick, father never completed the parent partner program even though he was referred for the service multiple times. Initially, the service provider was unable to reach father. When contact was eventually established, the parent partner worker reported that father was verbally abusive to her and terminated the service because she did not feel comfortable working with him. Father completed two psychological evaluations. Despite being referred for a psychiatric evaluation 10 times during the course of the case, father did not complete this evaluation until August 2021. Strick testified that father "flat out refused to do a psychiatric evaluation" until recently. Strick had concerns about father's mental health because his recent psychiatric evaluation recommended psychotropic medication and father had refused to submit to a psychiatric evaluation earlier. The psychiatric evaluation report indicated that father was diagnosed with personality disorder and depression. According to Strick, the psychological evaluation report included similar diagnoses. Strick testified that father was never referred for Infant Mental Health services.

Father missed 44 of 127 offered visits with DMW. Strick had observed some of the visitation. Father had also been late for visits and had left visits early. Strick stated that father had difficulty soothing DMW in the beginning but that father had recently shown improvement in his interactions with the child and DMW got upset when father failed to show up. Strick clarified that father's behavior in visits had improved, but his consistency in attendance had not. DMW had been placed in a "preadoptive" home since April 2021, and he was doing well in his current placement.

On cross-examination, father's counsel questioned Strick as follows regarding father's mental health diagnoses:

> *Q.* Okay. Now with those diagnosis [sic] did it occur to you that maybe he should be offered some specialized services?
>
> *A.* Absolutely.
>
> *Q.* Okay. And were those offered?
>
> *A.* We discussed that many, many times and he was in denial that he needed mental health help. He said that that was not something that was any of my business.

* * *

*Q.* Well, let me ask you this: Did you ever try to do something beyond what you would normally do for a person that doesn't have any types of personality disorders or depression?

*A.* No.

*Q.* Okay.

*A.* We just got the diagnosis recently so there wasn't really, I mean, I'm not I guess I'm not understanding what other services beside if he's recommended for parenting classes he's referred for parenting classes and that's nothing beyond that was done, no.

Strick provided additional clarification on redirect:

*Q.* With regard to specialized services, isn't parent partner a specialized service?

*A.* That is, yes.

*Q.* Okay. And what is the role of a parent partner? Why does the Court order it or why are those referrals made?

*A.* A parent partner is somebody that has gone through the system themselves and had a CPS case history and have completed successfully and are able to mentor our clients in the process and navigating the parenting, and they actually do one-on-one parenting in the home or any other supervised setting if need be.

*Q.* Okay. And that parent partner could also assist with advising a parent with regard to parenting techniques as well?

*A.* Yes.

*Q.* Is that correct?

*A.* Correct.

*Q.* Father has either refused or failed to comply with that service, is that true?

*A.* Correct.

Strick indicated that termination of father's parental rights was recommended because he had not rectified the issues that brought the child into care, it did not seem that father could do so if given a specific amount of time, and father was not currently able to provide proper care and custody for the child. Strick believed termination was in DMW's best interest because father could

not currently care for the child, meet his needs, or keep him safe from harm. Additionally, the current foster family could provide permanency and stability.

The trial court terminated father's parental rights. Father now appeals.

## II. REASONABLE EFFORTS

Father first argues that the trial court erred in terminating his parental rights because reasonable efforts were not made to preserve the family. Specifically, father asserts that he was not provided with services tailored to his mental-health related disability as required by the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*. Father argues that the DHHS was on notice of his disability as a result of his testimony at the March 21, 2019 hearing that he received Social Security disability income based on his depression. In his appellate brief, father states, "While there was lip-service, and even some Court orders requiring Infant Mental Health, Parent Partner, and a parenting coach or other supportive parenting assistance, it is uncontroverted that none of these services ever happened."

This Court generally reviews a trial court's finding "that reasonable efforts were made to preserve and reunify the family" for clear error. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). "A finding is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re Schadler*, 315 Mich App 406, 408; 890 NW2d 676 (2016) (quotation marks and citation omitted). Reunification efforts are not reasonable if the DHHS "has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017).

In general, and with the exception of certain enumerated circumstances not applicable in this case,[4] the DHHS has an affirmative duty under Michigan's Probate Code, MCL 710.21 *et seq*., to make reasonable efforts to reunify a family before seeking to terminate parental rights. *In re Hicks/Brown*, 500 Mich at 85 & n 4, citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). Additionally, the DHHS "also has obligations under the ADA that dovetail with its obligations under the Probate Code." *In re Hicks/Brown*, 500 Mich at 86. As our Supreme Court explained, "Title II of the ADA requires that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *Id*., quoting 42 USC 12132. "Absent reasonable modifications to the services or programs offered to a disabled parent, the Department has failed in its duty under the ADA to reasonably accommodate a disability." *In re Hicks/Brown*, 500 Mich at 86. Consequently, the Department has also "failed in its duty to make reasonable efforts at reunification under MCL 712A.19a(2)." *Id*.

In this case, the record reflects that the trial court ordered numerous services that could have potentially been of benefit to father in light of his mental health issues, including a psychiatric evaluation, Infant Mental Health, parenting classes, parent partner, and a parenting coach. Father also completed a psychological evaluation that recommended a psychiatric evaluation. It was

---

[4] There is no argument that any of the enumerated circumstances apply in this case.

-7-

determined early in the case that father received Social Security disability income based on his depression, and it was this fact that prompted the attempts to implement services directed at assessing the status of father's mental health so as to accurately determine the nature of services he needed.

Viewing the record in its entirety, it is clear that despite any shortcomings on the part of the DHHS, father did not wish to participate during the course of the proceedings below in the services that he now claims on appeal should have been implemented. Father stated on the record that he did not need Infant Mental Health or parent partner services. The parent partner service was eventually implemented, but it was terminated after father verbally abused the worker. Father was ordered to complete a psychiatric evaluation, *based on the nature of his claimed disability*, and he was referred for this service 10 times before he finally completed it shortly before the termination trial. Father waited more than two years to follow through with completing his psychiatric evaluation. The purpose of ordering father to complete a psychiatric evaluation was to assess the nature of his mental health so as to determine what services would be beneficial for him. By refusing to participate in this evaluation, father effectively prevented further relevant services from being implemented.

Thus, the record reflects that the DHHS attempted to work with father and provide him with appropriate services responsive to his mental health disability, but father failed to sufficiently participate and benefit from the services offered. More specifically, father affirmatively disavowed any need for such services on the record and seemed, through his actions, to show that that he did not believe he needed such services. "While the DHS has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App at 248. This includes the requirement that the respondent "sufficiently benefited from the services provided." *Id.*

The circumstances of this case are factually distinguishable from those in *In re Newman*, 189 Mich App 61; 472 NW2d 38 (1991). In that case, the respondents' issues that led to the removal of their children, and termination of their parental rights, involved dirty, unsafe, and unsanitary home conditions, as well as poor personal hygiene of all the family members. *Id*. at 62-64. On appeal, this Court acknowledged that the respondents had struggled with keeping their home clean enough to make it habitable for children but further stated that "it is also readily apparent from the testimony that respondents, particularly Wendy Newman because of her limited intellectual capacity, needs hands-on instruction, most probably repeatedly, on how to clean and maintain the home." *Id*. at 65-66. In concluding that the trial court erred by relying on the conditions in the home as a basis for terminating the respondents' parental rights, *id*. at 67, this Court reasoned in pertinent part as follows:

> The homemaker assigned to this family testified that she purchased cleaning supplies for respondents, but quite some time ago stopped going into the house because it was so dirty. This was the person who was supposed to help respondents remedy this problem, but she refused. How then can we say there is no reasonable likelihood that the conditions in the home would not be rectified within a reasonable time when the one person who could have helped respondents remedy the conditions refused to do so? [*Id*. at 66.]

Additionally, this Court noted the evidence that the respondents demonstrated during the course of the case an ability and willingness to learn, as well as noticeable improvements in keeping the house clean. *Id*. at 66-67. This Court also noted that the respondents' infant child had not been removed from their care despite the alleged filthy home conditions. *Id*. at 67. The *Newman* Court concluded: "[R]espondents were not given a full and fair opportunity to maintain the home. They need help. It was not shown that after being given consistent assistance they still did not rectify the conditions." *Id*. at 67-68.

Here, unlike the circumstances in *Newman*, it was father—not the DHHS—who sabotaged his opportunities to participate in and benefit from services designed to address his mental health issues in relation to his ability to parent. Father appears to at least tacitly acknowledge as much on appeal. However, father seems to argue that due to the nature of his alleged mental health disability, the DHHS was essentially required to *absolutely ensure* that father engaged with his services because father could not be expected to follow through with anything on his own. This extreme level of "hand-holding" is far beyond what could be considered a *reasonable* accommodation of father's disability or *reasonable* efforts at reunification. See *In re Hicks/Brown*, 500 Mich at 85-86. As this Court has explained:

> The ADA does not require petitioner to provide respondent with full-time, live-in assistance with her children.
>
> Respondent's contention that she needed even more assistance from petitioner to properly care for her children merely provides additional support for the family court's decision to terminate her parental rights. After her children have come within the jurisdiction of the family court, a parent, whether disabled or not, must demonstrate that she can meet their basic needs before they will be returned to her care. If a parent cannot or will not meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent. [*In re Terry*, 240 Mich App at 27-28 (quotation marks and citations omitted).]

In this case, the trial court did not clearly err by finding that father was provided with reasonable reunification efforts. *In re Fried*, 266 Mich App at 542-543.

## III. STATUTORY GROUNDS

Father next argues that the trial court erred by terminating his parental rights because there was not clear and convincing evidence that one of the statutory grounds for termination was established.

A trial court's decision that a statutory ground for termination has been proven by clear and convincing evidence is reviewed for clear error on appeal. *In re Fried*, 266 Mich App at 541.

"In order to terminate parental rights, the court must find that at least one of the statutory grounds set forth in MCL 712A.19b has been met by clear and convincing evidence." *Id*. at 540-541. As grounds for termination, the trial court cited MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), which provide as follows:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

\* \* \*

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Here, DMW was removed from father's care based in part on his lack of adequate housing. Father was adjudicated based on his plea of admission to allegations in the petition, which included father's admission that he lacked suitable housing. Throughout the duration of this case, which lasted almost three years, father was never able to rectify this condition. At various times, father either had no permanent address or he claimed to have a residence but it could not be approved due to its physical conditions or issues with the other people living in the residence. DMW had been in foster care for virtually his entire life, and father still had not demonstrated that he could provide the basic requirement of suitable housing for his child. Accordingly, the trial court did not clearly err by finding that MCL 712A.19b(3)(c)(*i*) had been proven by clear and convincing evidence. "Only one statutory ground for termination need be established." *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012).

IV. BEST INTERESTS

Finally, father challenges the trial court's decision that terminating his parental rights was in DMW's best interests.

The trial court's best-interests determination is reviewed for clear error. *In re Fried*, 266 Mich App at 541.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App at 40. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

At the best-interest stage, the focus is on the child and not the parent. *Id*. at 87. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). A court may also consider the length of time that the minor child was placed in foster care and the likelihood that the child could be returned to the parent's home within the foreseeable future. *In re Frey*, 297 Mich App at 248-249.

Here, DMW had been in foster care for all three years of his life. During that time, father never demonstrated that he was able to accomplish the basic task of obtaining suitable housing that could be approved by the DHHS, despite the length of time and assistance he received. Given father's track record with his housing situation, as well as his failure to adequately complete and benefit from other services aimed at addressing his mental health and parenting issues, it did not appear likely that DMW could be returned to father's care within a reasonable time given the child's age. DMW needed permanency and stability. The trial court thus did not clearly err by finding that terminating father's parental rights was in the child's best interests. *In re Fried*, 266 Mich App at 541.

Affirmed.

/s/ Michael J. Riordan
/s/ Stephen L. Borrello
/s/ Anica Letica