*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* RGS and JGS, Minors.

UNPUBLISHED
March 21, 2024

No. 366274
Ingham Circuit Court
Family Division
LC Nos. 22-000407-NA;
           22-000408-NA

Before: M. J. KELLY, P.J., and BOONSTRA and CAMERON, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating his parental rights to his two minor children, RGS and JGS, under MCL 712A.19b(3)(g) (failure to provide proper care or custody).[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In May 2022, petitioner, the Department of Health and Human Services (DHHS), filed a petition requesting that the trial court exercise jurisdiction over RGS and JGS and remove them from respondent's care. DHHS alleged that respondent had issues with substance abuse, had physically abused JGS, had assaulted his wife (MS) multiple times in front of the children (including attempting to strangle her), had called the children names and threatened to "kill everyone in the home," and had allegedly exposed his penis to his 16 year-old daughter.[2] A DHHS caseworker, Katrina Dennings, testified that respondent had been receiving services for six months, but had failed to benefit from them. Dennings also testified that respondent had tested positive for methamphetamines in March 2022, and had been noncompliant with multiple services. The trial court authorized the petition and ordered the removal of the children. Respondent at first

---

[1] The parental rights of the children's mother were previously terminated in a separate proceeding in a different jurisdiction, and she is not a party to this appeal. At the time of the proceedings below, respondent had sole custody of the children.

[2] The evidence established that respondent was this child's biological father but not her legal father. She is not one of the children at issue in this case.

failed to produce the children as ordered and was charged with parental kidnapping, after which he surrendered the children, who were placed in nonrelative foster care. Respondent ultimately pleaded guilty to parental kidnapping and was placed on probation. Respondent was ordered to continue services, including drug screening, and to refrain from using controlled substances.

An adjudication bench trial was held in August and September 2022. In October 2022, respondent's visitations with the children were suspended based on the recommendation of the children's therapist, who stated that JGS had been having nightmares and that RGS had exhibited "sexualized behaviors" at a slumber party. The trial court issued a written opinion in November 2022, concluding that the exercise of jurisdiction over the children was appropriate. JGS later disclosed that respondent had physically abused him, and RGS disclosed that respondent had sexually abused her.

From November 2022 until February 2023, respondent mostly failed to comply with or benefit from his court-ordered services. Respondent was ordered to submit to drug testing three times per week, but only submitted to six screens in six months. Respondent tested positive for tetrahydrocannabinol (THC), the active ingredient in marijuana, at all six drug screens. Appointments were made for respondent to receive a substance abuse assessment and individual therapy, but he missed those appointments. Kai'chea Wright, a foster care worker with DHHS, repeatedly noted that when respondent was not incarcerated, he was very difficult to reach, did not have a permanent address or telephone, and often did not attend appointments.

In February 2023 respondent was arrested and charged with two counts of criminal sexual conduct in the second degree related to his alleged sexual abuse of RGS. Respondent was still incarcerated when the termination hearing was held in May 2023.

At the termination hearing, respondent testified and denied ever abusing RGS or JGS, and denied having committed domestic violence against MS. He admitted that he had not tried to contact his children or resume visitation since October 2022, and that he had stopped talking to his caseworker because he did not trust DHHS. Respondent and MS had been evicted from their home in Mason and respondent currently did not have a place to live; however, he claimed that he and the children could live at a hotel in Grand Rapids where MS worked. He also claimed that he could work at the hotel when released from jail. Respondent denied that he had an issue with domestic violence and stated that he had tried to attend domestic violence counseling but had stopped because he had never hit anyone and did not fit in there. Respondent admitted to having had a problem with alcohol in the past, but stated that he had stopped drinking before the children's removal; he claimed that his use of marijuana was medical and that he had obtained a medical-marijuana card, although he admitted that he had never provided that card to DHHS. Respondent testified that, at the beginning of the case, MS had been making "a substantial amount of money," and so he "took care of the kids mostly" and had been looking into doing tattooing. He said that he had not had to "worry about" money because of MS's job, that the "children's needs [had been] very well met" and that they had new clothes, food, and a horse.

Respondent's probation officer from the parental kidnapping charge testified that respondent had been noncompliant with several probationary requirements, including refusing to attend counselling and missing drug screens. A Children's Protective Services (CPS) investigator testified that RGS and JGS had been interviewed at a child-advocacy center and had disclosed

physical and sexual abuse. The investigator testified that the children were thriving in their current placement.

Wright testified that the initial barriers to reunification of emotional instability, domestic violence, substance abuse, and lack of parenting skills were still present, and that housing and employment had become additional issues since the children's adjudication. Wright testified that respondent had refused to sign a release that would allow her to obtain information about what services respondent had participated in while incarcerated. Wright said that respondent was frequently aggressive and argumentative during the meetings he did attend. Respondent had not done any individual counseling. Wright did not believe that a bond existed between respondent and the children, noting that the children had not asked about him and had told her they wanted to stay at their current foster home, which was pre-adoptive.

At the close of proofs, the trial court concluded that petitioner had established the ground for termination in MCL 712A.19b(3)(g). It said that the amount of moving from place-to-place that had taken place recently was "a huge issue," and that having the children live at a hotel would not provide them with stability. It noted that respondent had never provided evidence of regular employment. The trial court also noted that respondent had neglected to provide RGS with needed dental care. And it noted that respondent was regularly using THC and intending to be a caretaker for the children.

The trial court noted respondent's parental kidnapping charge and failure to comply with his probation requirements, and also noted that MS had obtained a personal protection order (PPO) against respondent in connection with domestic violence. The trial court concluded that respondent had anger issues that he had not addressed.

The trial court concluded that respondent was not likely to be able to provide proper care and custody for the children because there had been "no improvement and no ability to address these issues or barriers for the care and custody of these children." It also noted that the children were very young and could not "sit in limbo forever."

The trial court then concluded that termination would be in the children's best interests. It noted that the foster-care worker, the CPS investigator, and the children's lawyer-guardian ad litem (LGAL) all supported termination, and that the children were in a pre-adoptive placement. The trial court stated that the young children had been in care a long time and deserved a "fresh start" in a place where they could have "stability to flourish and not chaos." The trial court declined to consider the testimony that the children did not want to go back to respondent because it "didn't hear that directly from the children." But it stated that respondent seemed to not be able to "focus on being a parent" and "put[] the kids first."

The trial court issued an order terminating respondent's parental rights to JGS and RGS. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground for termination has been established by clear and convincing evidence, *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous

if, even if some evidence supports it, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id.* This Court gives deference to the trial court's credibility determinations. See, e.g., *In re Newman*, 189 Mich App 61, 65; 472 NW2d 38 (1991).

We review unpreserved issues for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008).

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court erred by holding that statutory grounds for termination had been proven by clear and convincing evidence. We disagree.

MCL 712A.19b(3) states, in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Respondent argues that the trial court should not have focused on his lack of housing or lack of employment. Respondent was incarcerated at the time of termination, but he asserts that he had a Baymont hotel suite to live in and a job at the hotel waiting for him should he be released from incarceration. However, he never provided verification of this information to his caseworker. In addition, and significantly, it was merely hypothetical that he would even be bonded out of jail and, subsequently, be cleared of the serious criminal-sexual-conduct charges he was facing. The record shows that at the time of the termination hearing, respondent was only speculating that he could obtain a job and a place to live; further, inasmuch as MS had obtained a PPO against him, it is far from certain that respondent could have gotten a job where she worked and lived in a hotel room next to her (even assuming that a hotel room was appropriate housing for an adult and two children, one male and one female). Moreover, Wright testified that respondent and MS's eviction from their previous home was not solely due to unpaid rent, but was also due to multiple instances in which the police were called to their home because of domestic disputes. Under these circumstances, the trial court did not clearly err by finding that respondent could not be reasonably expected to provide adequate, stable housing for the children within a reasonable time, for reasons other than the lack of the financial ability to do so.

Respondent also argues that the trial court should not have found that his marijuana use impaired his ability to provide care and custody for the children. Respondent relies in large part on *In re Richardson*, 329 Mich App 232, 252-253; 961 NW2d 499 (2019), wherein this Court concluded that medical-marijuana use itself cannot be the basis of neglect in the absence of evidence that it interferes with parenting. The present case is distinguishable from *Richardson*. First, respondent admitted that he never gave DHHS a copy of the medical-marijuana card that he

claimed to have obtained in connection with seeking treatment for anxiety and post-traumatic stress disorder, and there was no proof that respondent had been prescribed marijuana as a treatment by a medical provider, apart from respondent's testimony. More importantly, the psychiatrist who evaluated respondent reported that respondent was "manic" and his reactions were "abnormal," and explained that in order to for him to truly assess and diagnose respondent's mental health issues and determine whether psychiatric medication was necessary, respondent would need to enter addiction treatment and participate in drug screens, because "cocaine or marijuana" "can induce a manic state." The psychiatrist also indicated that respondent had poor judgment and poor insight. Respondent's use of marijuana was a barrier to the proper addressing of his mental health issues, which impacted his ability to provide care and custody for his children. Under these circumstances, the trial court's reliance on respondent's marijuana use was not clearly erroneous; further, we note that the trial court did not place a great deal of weight on respondent's marijuana use compared to numerous other factors, such as respondent's anger and domestic violence issues.

Respondent also argues that the trial court should not have found that respondent had anger and domestic violence issues, claiming that he was not the perpetrator of any violence and that the children were under no threat. But the evidence as a whole was adequate to support the trial court's conclusion that domestic violence was an issue. First, the psychiatrist, as noted, indicated that respondent was abnormal and manic. In addition, MS testified that she had obtained a PPO against respondent around April 2022. She said that the basis for the PPO had been "fighting, yelling, screaming," and "[t]hings like that." She admitted that respondent had yelled instead of communicating properly with the children and had used some "harsh" "techniques."

Police were called to respondent and MS's home multiple times as a result of domestic disputes. A police officer testified that, during one of the times he went to respondent and MS's home, "[i]t was very hostile" and there was a "lot[] of [s]creaming, mostly from [respondent]." The officers were concerned for their safety. It was elicited during a police officer's testimony that there had been an arrest out of the home "for domestic violence and strangulation" on February 11, 2022.

A DHHS worker testified that she had observed a video in which respondent, in an aggressive manner, was calling MS a "wh*re" and a "c*nt"[3] and calling the children "little f*ckers." In the video, respondent could be seen throwing a metal object at MS and throwing other items. The worker stated that respondent's 16-year-old daughter had been doing the filming, and in the video, respondent "pull[ed] out his penis" and said "film this" to her. The worker further testified that when she was attempting to find the children in connection with the removal order, respondent was "screaming" and "yelling" and told her to "choke on a d*ck."

A Families First worker testified at the termination hearing that children can be harmed on the basis of verbal "domestic violence" even if they are not physically harmed. And respondent's

---

[3] Respondent admitted that he might have called MS these names. And he admitted that the children at issue were in the home at the time.

daughter admitted that respondent and MS frequently argued, and that the arguments became intense; she admitted to making videos "when things would get bad" at the home.

As stated, Wright testified that respondent was frequently aggressive and confrontational. At least one incident in which respondent screamed at Wright took place in front of the children. Wright also testified that she had visited respondent in jail in 2023, and that "if [she] didn't say what he wanted he just stormed off and left." And at a hearing in 2023, the trial court had to reprimand respondent for raising his voice.

Respondent's visitations were suspended in October 2022 on the basis of concerns raised by the children's therapist. Wright testified that JGS had ongoing issues with anger and stealing and had been bullying other children, and RGS had exhibited some concerning sexual behaviors. She opined that respondent did not have the ability to parent the children "[b]ecause he has not done any individual counseling services or anything that would improve his temperament or mood." The worker opined that the children would be harmed physically or mentally if returned to respondent. She did not believe that respondent would be able to parent the children appropriately in a reasonable amount of time, in light of "the children's perception of the trauma or the things they experienced from home."

Respondent admitted that he had not been going to domestic-violence counseling because "there would be no reason for" such counseling. He disagreed that domestic violence was a concern in his life.

The evidence provided to the trial court was more than sufficient to support the trial court's finding that respondent had issues with anger and domestic violence, that he was not likely to resolve these issues within a reasonable time, and that they posed a risk to the children. Although respondent notes that MS testified at one point that respondent never hit her, and his daughter testified that respondent had not exposed his penis to her, we will not second-guess the trial court's credibility determinations. *Newman*, 189 Mich App at 65.

Additionally, a parent's failure to comply with and benefit from a case service plan is evidence that the parent will not be able to provide proper care and custody. *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). The record in this case shows that respondent nearly completely failed to participate in or benefit from multiple services to which he was referred, whether they were voluntary, court-ordered, or a condition of his probation. The trial court did not clearly err by finding that statutory grounds for termination had been proven by clear and convincing evidence.[4] *Mason*, 486 Mich at 152.

IV. EFFORTS TOWARD REUNIFICATION

Respondent also argues that the trial court erred by determining that statutory grounds for termination had been proven despite inadequate efforts from DHHS toward reunification. Specifically, respondent argues that DHHS's efforts toward family reunification were not adequate

---

[4] Respondent does not make a specific argument on appeal about the trial court's best-interests finding.

because he should have been referred to cognitive-behavioral therapy (CBT). As respondent did not raise this issue before the trial court, we will review it for plain error affecting substantial rights. *Utrera*, 281 Mich App at 8-9; see also *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019).

Unless certain aggravated circumstances are present, "[DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017); see also *In re Rippy*, 330 Mich App 350, 355; 948 NW2d 131 (2019). "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.). As stated in *In re MJC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 365616); slip op at 4, "[I]f the parent had received inadequate services, this could suggest that the barriers to reunification could yet be lifted if the parent is given adequate support."

Respondent has not established plain error that affected the outcome of the proceedings. *Utrera*, 281 Mich App at 8-9. In the first instance, respondent has not established that CBT was a necessary therapy for him. Even assuming, without deciding, that a referral for CBT would have been appropriate, respondent was chronically noncompliant with DHHS's offered services, and specifically noncompliant with referrals for individual therapy. In fact, respondent can only speculate about whether he would have received CBT from the counseling service to which he was referred, or would have been referred by his initial therapist to a more appropriate provider, since respondent never actually attended any appointments that were scheduled for him. Moreover, respondent stated several times that he believed he had no current problems with substance use, anger, or domestic violence. There is no indication in the record that respondent ever intended to participate in any counseling or therapy services, or that he would have complied with a CBT referral if it had been offered.

Affirmed.

/s/ Michael J. Kelly
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron