*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LOGAN, Minors.

UNPUBLISHED
December 22, 2022

Nos. 361236; 361238
Wayne Circuit Court
Family Division
LC No. 2020-000796-NA

Before: HOOD, P.J., and SWARTZLE and REDFORD, JJ.

PER CURIAM.

In these consolidated appeals, respondent parents of the minor children DJL, NRL, OJL, SNL, TDL and ZOL, each appeal as of right the trial court's order terminating their respective parental rights to the children under MCL 712A.19b(3)(b)(*ii*), (g), and (j). We affirm.

## I. BACKGROUND

The children were originally removed from respondents' care in April 2020 because of the family home's deplorable condition and lack of working utilities. At that time, the children were placed with fictive kin pursuant to a voluntary safety plan while respondents were provided services to assist with budgeting, parenting skills, and housing. When respondents' situation did not improve, the Department of Health and Human Services (DHHS) filed a petition in August 2020 seeking temporary custody of the children. In September 2020, respondents entered pleas of admission and the court acquired jurisdiction over the children. Respondents were offered treatment plans designed to address the barriers to reunification.

Several months after the adjudication, petitioner received information that two of the children, SNL and TDL, were victims of ongoing sexual abuse by respondent-father's other 16-year-old son, AL, while in respondents' care. An investigation by Child Protective Services (CPS) substantiated the allegations. In January 2022, DHHS filed a supplemental petition for termination of respondents' parental rights. At the termination hearing, SNL and TDL both testified that they were sexually abused by AL multiple times. They described incidents of sexual abuse against them directly, as well as observing AL commit acts of sexual abuse against the other sibling. They also described acts of sexual abuse by AL against NRL and ZOL. The children reported AL's sexual abuse to respondents, but respondents either told the children that they did not believe them

-1-

or failed to do anything to prevent the abuse, and they continued to allow AL to remain in the home.

SNL testified that respondent-father's brother was allowed at the family home and touched SNL's breasts more than once. Respondent-father's brother was convicted of criminal sexual conduct for sexually assaulting another child, but he had been released on parole at the time of the termination hearing. At the hearing, respondent-father testified that he would not allow his brother to visit the family home only because it would violate the terms of his brother's parole, but that if his brother was not on parole, he would allow his brother to visit the home, but not allow him to be around the children.

Following the hearing, the trial court found that clear and convincing evidence established grounds for termination of respondents' parental rights under MCL 712A.19b(3)(b)(*ii*), (g), and (j), and that termination of respondents' parental rights served the children's best interests. Both respondents now appeal.

## II. ANALYSIS

### A. STATUTORY GROUNDS FOR TERMINATION

Both respondents argue that the trial court erred by finding that the cited statutory grounds for termination were established by clear and convincing evidence. Respondent-mother, however, does not directly discuss the evidentiary support for the various statutory grounds for termination. Instead, she asserts that DHHS "failed in its duty to make reasonable efforts at reunification under MCL 712A.19a(2)." Respondent-father similarly argues that petitioner failed to make reasonable efforts toward reunification, but also separately contests the evidentiary support for the cited statutory grounds for termination. To the extent that respondents challenge the adequacy of petitioner's reunification efforts, because respondents did not raise any challenge to the adequacy of petitioner's services in the trial court, their appellate challenge to the adequacy of those services is unpreserved. *In re Terry*, 240 Mich App 14, 27; 610 NW2d 563 (2000).

To terminate parental rights, the trial court must find that at least one statutory ground under MCL 712A.19b(3) has been established by clear and convincing evidence. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). We review for clear error a trial court's finding whether a statutory ground for termination has been proven by clear and convincing evidence. MCR 3.977(K). Likewise, we review for clear error the trial court's factual finding that petitioner made reasonable efforts to reunify a respondent with the child. *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos 358502, 358503); slip op at 3. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id.*; see also *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). However, this Court reviews unpreserved issues for plain error affecting substantial rights. *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019). To be entitled to appellate relief, respondent-mother "must establish that (1) error occurred; (2) the error was 'plain,' i.e., clear or obvious; and (3) the plain error affected [her] substantial rights." *Id.* Further, the error must have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings[] . . . ." *Id.*, quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The trial court terminated respondents' parental rights under MCL 712A.19b(3)(b)(*ii*), (g), and (j), which permit termination of parental rights under the following circumstances:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> \* \* \*

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

> \* \* \*

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> \* \* \*

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Because termination of parental rights can be premature if petitioner fails to make reasonable efforts toward reunification, *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010); *In re Newman*, 189 Mich App 61, 66-70; 472 NW2d 38 (1991), and "[t]he adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights[,]" *In re Rood,* 483 Mich 73, 89; 763 NW2d 587 (2009), we initially address respondents' arguments that petitioner failed to make reasonable efforts toward reunification. We find no plain error in this regard.

Under the probate code, petitioner "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.19a(2). Petitioner's reasonable efforts must also comply with the Americans with Disabilities Act (ADA), which requires petitioner to "modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *In re Hicks/Brown*, 500 Mich at 86. Although petitioner "cannot accommodate a disability of which it is unaware[,]" *id*. at 87, the obligation to make accommodations under the ADA extends to providing reasonable accommodations to "a parent with a known or suspected intellectual, cognitive, or developmental impairment." *In re Sanborn*, 337 Mich App 252, 263; 976 NW2d 44 (2021) (quotation marks and citation omitted). Petitioner's affirmative duty to use reasonable efforts, means that petitioner cannot be "passive" in its approach to providing accommodations. *In re Hicks/Brown*, 500 Mich at 87-88.

In this case, the record discloses that petitioner was aware of respondent-mother's cognitive impairment and mental health issues. At the time of the petition's filing, petitioner was aware that respondent-mother had already been working with and receiving services from the Neighborhood Service Organization (NSO) for two years. Those services included individual therapy, psychiatric services, and support coordination for respondent-mother's mental health and cognitive impairment. At a family team meeting on July 22, 2020, respondent-mother admitted that she needed a guardian because she could not make decisions for herself. At the adjudication, respondent-mother admitted that she had previously been under a guardianship due to a cognitive impairment. A psychiatric evaluation revealed that respondent-mother had a very low IQ, was severely depressed, needed help making important medical and financial decisions, which warranted appointing her a legal guardian. Respondent-mother's uncle served as her former guardian, but he had died and was not replaced with a new guardian. Petitioner was also aware that respondent-mother received Social Security disability payments because of her cognitive impairment. Further, petitioner was aware that respondent-father had attended special education classes because of a learning disability. He also received Social Security disability benefits until 21 years old. Although the record clearly discloses that petitioner was aware of respondents' cognitive impairments, it does not support respondents' arguments that petitioner failed to provide reasonable and appropriate reunification services.

To satisfy its obligation to make reasonable efforts toward reunification, petitioner "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich at 85-86. "While [petitioner] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

After the adjudication, petitioner prepared treatment plans for both respondents, and the trial court ordered petitioner to provide services that would assist respondents consistent with their cognitive abilities. As noted, neither respondent ever raised any objection to the adequacy of the services that were offered. The record discloses that both respondents were referred for specialized services that included individual therapy and parenting classes through Family Care Network. They were also referred to In-Home Care Services to learn effective communication skills, to maintain suitable housing and find resources for furnishings, and to engage in better decision-making and coping skills to deal with stress. The services were designed to assist respondents in providing appropriate care for their children. The assigned case-management services therapist, Jasmine Stephens, worked with respondents to find appropriate housing. Stephens reported that although respondent-mother had been given several resources, she expressed her frustration with the process. Stephens advised respondents on the importance of finding appropriate housing to accommodate their family. NSO also provided assistance to find an appropriate guardian for respondent-mother.

Respondents participated in the Supportive Visitation Program from March 29, 2021 through August 6, 2021. The supportive visitation worker supervised the parenting time along with the caseworker, Nicole Rowley, to assist respondents with their interactions with the children, including discipline, supervision, and engagement with the children. Respondents were also offered and participated in Infant Mental Health (IMH) services with OJL and NRL. The IMH

therapist attended the visits between respondents and OJL and NRL. Respondents were assigned a parent-partner through the Judson Center on June 8, 2021, and respondent-mother participated in services with the parent-partner, which included assistance with housing resources and landlord-tenant advice. Respondent-father, however, chose not to participate in the services with the parent-partner, despite being encouraged to participate in those services.

This case is distinguishable from *In re Hicks/Brown*, on which respondent-mother relies. In that case, the respondent specifically requested services through NSO, arguing that NSO could provide services that would accommodate the respondent's intellectual disability. *In re Hicks/Brown*, 500 Mich at 89. The trial court agreed and ordered services through NSO, but the petitioner failed to provide the services. *Id*. The Court reversed the trial court's termination of the respondent's parental rights because the trial court failed to consider that the petitioner failed to provide specific services the court had ordered to reasonably accommodate the respondent's disability. *Id*. at 90.

In this case, respondent-mother had been receiving NSO services for two years before the children were removed from her care. During the case, NSO increased respondent-mother's services and Rowley worked with respondent-mother's NSO support coordinator to help respondent-mother. At a conference between Rowley, respondent-mother, and her NSO support coordinator, it was reported that NSO had approved respondent-mother to receive 24 hours of in-home respite services a month and community living support services through Pro Care Unlimited to assist with life skills. NSO also assisted respondent-mother in filing for a partial guardian. Unlike in *In re Hicks*, there were no additional services requested by respondent-mother that were not provided.

In sum, the record reveals that both respondents were offered and provided an array of individualized and specialized services aimed at rectifying the conditions that led to the children's removal and providing them with long-term solutions to cope with their mental health, cognitive impairment, and health issues. Respondents successfully completed parenting classes. Respondent-mother continued individual therapy through NSO. As a follow-up, respondents were offered and participated in services, such as the Supportive Parenting Program, IMH services, and case-management services. All of these services offered one-on-one engagement to address respondents' specific needs and to accommodate their cognitive impairments. Contrary to respondent-mother's argument, the parent-partner specifically offered resources and advice regarding respondents' housing situation. Further, respondent-mother was provided assistance with securing appropriate housing by both NSO and Rowley. Respondent-father was offered, but refused to participate in, services offered by the parent-partner. Considering this evidence, and respondents' failure to articulate what additional services they believe should have been offered or would have more reasonably accommodated their cognitive impairments, we find no merit to respondents' arguments that petitioner failed to meet its statutory duty to make reasonable efforts to reunify respondents with their children.

Because respondent-mother does not further challenge the evidentiary support for the trial court's findings that the statutory grounds for termination were established by clear and convincing evidence, or otherwise challenge the trial court's decision, we affirm the trial court's order terminating respondent-mother's parental rights to the children.

Respondent-father argues that the evidence did not support termination of his parental rights under MCL 712A.19b(3)(b)(*ii*), (g), and (j). We disagree.

First, the evidence clearly established that respondent-father was aware that his daughters were being sexually abuse by AL and failed to do anything to prevent the abuse from reoccurring. SNL and TDL both testified that AL committed acts of sexual abuse against them directly, and also testified that they witnessed AL sexually abusing the other and also their younger sisters. Although the timeline was not always clear, TDL testified that AL sexually abused her, and she also saw him sexually abusing SNL, ZOL, and NRL. TDL testified that she watched AL remove SNL's clothing and touch her breasts, and she witnessed AL rub his body against ZOL while he held her back to his front. TDL also saw AL expose and touch his penis in front of ZOL. According to TDL, AL sexually abused her between 10 and 20 times. She also saw AL lying on top of NRL while she was naked.

TDL testified that she previously told respondent-mother about AL abusing her sisters, but respondent-mother did not believe her. TDL also testified that she told respondent-father about AL touching SNL's breasts, and respondent-father reacted by becoming angry and yelling, "This is like the fifteenth time you've done this to one of my kids." TDL testified that she told respondent-father at least twice that AL was abusing her and her sisters, and that respondent-father once witnessed AL lying on top of her, at which time he pulled AL off of her and spanked him. Despite the many incidents of abuse and respondent-father being made aware of the abuse, AL was allowed to continue to live in the house with the children and the sexual abuse continued.

SNL similarly testified that AL had done multiple things to her that made her uncomfortable, such as touching her breasts. SNL also witnessed AL touching TDL in the middle of the night while TDL was asleep. SNL testified that she never told any of the adults who lived in the house and she did not confront AL because she was afraid. But SNL testified that respondents told her and TDL to stay away from AL when they discovered what he had been doing to the girls.

Alexis Grandison, a CPS specialist, confirmed that TDL's and SNL's testimony was consistent with the information they had related to her and had revealed during their Kids Talk forensic interviews. The trial court expressly found SNL and TDL to be credible witnesses.

While there was evidence that CPS placed AL in respondents' home after they learned that he had been sexually abusing his other half-sisters in another home, there was clear and convincing evidence that respondents continued to allow AL to live in their home after they learned that he sexually abused SNL, TDL, ZOL, and NRL, and they did nothing to otherwise protect the girls from continued sexual abuse. The trial court did not clearly err by finding that clear and convincing evidence established that respondent-father had the opportunity to prevent the sexual abuse of his daughters and failed to do so. Moreover, considering the evidence that respondent-father was unwilling to have AL removed from his home after becoming aware that he sexually abused the girls, and his testimony at the termination that he did not believe many of the girls' allegations, despite the consistency of their accounts and that their allegations were corroborated by each other, the trial court did not clearly err by finding that a reasonable likelihood existed that the children would suffer injury or abuse in the foreseeable future if placed in respondent-father's home.

Further, the trial court did not clearly err by finding that respondent-father failed to provide proper care or custody for the children and that no reasonable expectation existed that he would be able to provide proper care and custody within a reasonable time considering the children's ages. The children were originally removed from respondents' care because respondents' home was an unfit place to live. At the time of the termination hearing, respondent-father admitted that the children could not live in the home where he lived because the basement was flooded. Although he anticipated that it would take two more months for him to secure appropriate housing, respondents had been living in the same house for approximately a year. The caseworker, Nicole Rowley, had advised respondents that the home was in foreclosure and the Adult Protective Services worker, Marlena Murphy, thought that respondents were squatting in the home because the conditions were so bad. Murphy observed that the front yard was littered with debris and had broken windows. From April through September 2021, Rowley expressed concern to respondents about the legitimacy of the property as a legal rental and about the conditions of the home, including broken windows, exposed wires, a hole in the floor, exposed nails from missing drywall, and an infestation of flies. The backyard was littered with broken glass, empty gas cans, and an abandoned boat. Respondents continued to live there and gave the landlord a $1,500 deposit and three months' rent at $750 a month, and they spent additional money on repairs to the property, including $1,200 for new countertops. On September 22, 2021, the landlord decided to sell the home. The record establishes that respondent-father failed to provide proper care and custody for the children by failing to provide a proper home and by failing to protect the girls from AL, even after becoming aware that AL continuously sexually abused the younger girls.

Respondent-father argues that termination of his parental rights under § 19b(3)(g) was improper because he had substantially complied with his treatment plan. Respondent-father did complete parenting classes, regularly and consistently visited with the children, and attended individual therapy and substance abuse counseling. However, he never obtained appropriate housing for the children and the evidence demonstrated that his decision-making and money-management skills had not improved as indicated by the expenditures that respondents made on a home that was unfit for the children and which may not have been a legitimate rental property. Considering this evidence, the trial court did not clearly err by finding that clear and convincing evidence established that respondent-father failed to provide proper care or custody for the children and no reasonable expectation existed that he would be able to provide proper care and custody within a reasonable time considering the children's ages.

The trial court also did not clearly err by finding that clear and convincing evidence established that the children were reasonably likely to be harmed if returned to respondent-father's home. Respondent-father lacked appropriate and suitable housing for the children. Considering his actions and decision-making regarding the house where he was living and the unsafe condition of the home the children were living in when this case began, a reasonable likelihood existed that the children would be at risk of harm if returned to respondent-father's home. Further, respondent-father's brother was convicted of criminal sexual conduct for sexually abusing a child, and SNL testified at the termination hearing that respondent-father's brother had touched her breasts more than once. At the termination hearing, respondent-father testified that he had concerns about his brother violating his parole by living with him, but he admitted that he would allow his brother to visit the home if he was not on parole. Respondent-father also gave inconsistent testimony regarding whether he believed SNL's and TDL's testimony regarding the sexual abuse they suffered at the hands of AL. The trial court did not err by finding that respondent-father did not

believe the children's testimony. This Court accords deference to the special opportunity of the trial court to judge the credibility of the witnesses. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005). This testimony further supports the trial court's finding that the children were reasonably likely to be harmed if returned to respondent-father's home because he was unwilling to protect the children from the risk of sexual abuse by his brother and AL. Accordingly, the trial court did not clearly err by finding that clear and convincing evidence establish statutory grounds for termination of respondent-father's parental rights under § 19b(3)(j).

Respondent-father also argues that the trial court erred by finding that termination of his parental rights served the children's best interests. We again disagree.

Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence. *In re Moss*, 301 Mich App at 90. This Court reviews for clear error the trial court's findings regarding a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

As explained in *In re White*:

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*Id.* at 713-714 (citation omitted).]

Although respondent-father emphasizes the bond he had with the children, that is only one factor to consider. Both SNL and TDL had been diagnosed with post-traumatic stress disorder and were in therapy because of the sexual abuse they experienced. The caseworker, Rowley, testified that the children had expressed to her that they were more comfortable when she was present during parenting time. SNL, TDL and ZOL had also expressed to Rowley that they would like to remain in their foster homes because they were terrified of returning to respondents' care. Respondent-father's testimony that he did not believe TDL's and SNL's testimony regarding the sexual abuse after they recounted so many incidents of sexual touching and abuse by AL, further supports the trial court's finding that the children were likely to be harmed if they were returned to respondent-father's care. The record evidence establishes that respondent-father lacked parenting ability and failed to provide the children a stable home. The record indicates that the children needed permanency, stability, and finality. The trial court did not clearly err by finding that respondent-father's refusal to believe his daughters about the sexual abuse was a strong indication that he would fail to protect them or his other children from future abuse. The trial court

did not clearly err by finding that termination of respondent-father's parental rights served each of the children's best interests.

Affirmed.

/s/ Noah P. Hood
/s/ Brock A. Swartzle
/s/ James Robert Redford