*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BOURBEAU, Minors.

UNPUBLISHED
December 22, 2022

No. 360286
Oakland Circuit Court
Family Division
LC No. 2015-832568-NA

Before: HOOD, P.J., and SWARTZLE and REDFORD, JJ.

PER CURIAM.

Respondent appeals as of right[1] the order terminating his parental rights to his two minor children, AJB and CMB, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (j) (reasonable likelihood of harm). We affirm.

## I. BACKGROUND

Respondent and his ex-wife, MB,[2] are the parents of two children: AJB and CMB. In 2015, petitioner, the Michigan Department of Health and Human Services (MDHHS), filed petitions relating to each child seeking removal. Among other allegations, MDHHS alleged that respondent and MB engaged in domestic violence in AJB's presence, that respondent verbally and physically abused AJB, that, because of inadequate supervision, CMB sustained injuries caused by AJB, that respondent's home—where he lived with his own parents—was not appropriate for the children, and that CMB had been living with his maternal grandmother almost since his birth.

---

[1] This case is before us for the second time. Previously, this Court affirmed the termination of respondent's parental rights. *In re Bourbeau*, unpublished per curiam opinion of the Court of Appeals, issued October 14, 2021 (Docket No. 356222), vacated and remanded by 969 NW2d 344 (Mich, 2022). As explained later, however, the Supreme Court vacated this Court's judgment and remanded to us for a "new appeal." *In re Bourbeau*, 969 NW2d 344 (Mich, 2022).

[2] MB was initially a respondent in this proceeding. In 2017, however, she agreed to termination of her parental rights, and she is not a party on appeal.

-1-

Respondent pleaded no contest, and the trial court assumed jurisdiction. The initial case service plan, adopted by the trial court in October 2015, provided respondent with supervised visitation with the children. The plan also required him to locate and maintain appropriate housing, maintain a legal source of income, participate in drug and alcohol screening, and participate in anger-management and individual therapy.

In October 2016, MDHHS filed a supplemental petition to terminate respondent's and MB's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). It alleged that respondent was not making enough progress on his case service plan. Particularly, he failed to obtain suitable housing, comply with and benefit from anger-management services, undergo a forensic assessment, submit to drug screens, and benefit from parenting classes. After several days of hearings between January 2017 and October 2017, the trial court declined to terminate respondent's parental rights. By that time, respondent had obtained suitable housing and maintained gainful employment. There was also no evidence of drug use, despite 26 drug screens. Although there were some initial concerns, respondent also consistently attended parenting-time visits, completed parenting classes, and participated in therapy and anger-management services. According to his therapist, Dr. James Eisenstadt, Ph.D., respondent was benefiting from those services. The trial court concluded that MDHHS failed to establish grounds for termination under MCL 712A.19b(3)(c)(*i*) and (g) because respondent had resolved some of the issues (such as obtaining housing and maintaining employment) leading to the adjudication, and had made objective and positive gains in other areas (such as parenting skills and anger management). Consequently, the trial court rejected MDHHS's assertion that respondent would not be able to resolve the remaining issues, nor provide proper care and custody within a reasonable time considering the children's ages.

In contrast, the trial court found that termination was warranted under MCL 712A.19b(3)(j) because respondent was not fully compliant with his parent-agency agreement and had not fully resolved all his issues. Although the trial court found grounds for termination under MCL 712A.19b(3)(j), the trial court determined that termination was not in the children's best interests. The court found that that the children shared a bond with respondent and that respondent was making progress toward reunification. Thus, the trial court did not terminate respondent's parental rights in 2017.

Dispositional review hearings resumed in December 2017 and continued through May 2019. At the hearing in December 2017, the court adopted an updated case service plan under which services aimed at reunification continued, including supervised parenting-time visits, a new parenting education program, and therapy with Dr. Eisenstadt. Respondent was also required to maintain suitable housing and continue to provide proof of employment. Substance-abuse monitoring requirements were, however, removed from the updated case service plan. The children remained in their respective placements.

Initial reports of respondent's compliance and benefit from the new plan were positive. In February 2018, for example, the trial court noted that respondent showed "fairly significant compliance" and indicated "we're going down a very positive path . . . ." In 2018, respondent received more expanded parenting time, including visits that were supervised by a designee (either respondent's girlfriend or brother) rather than MDHHS or an agency. At a review hearing in February 2019, however, Jefferson Bach, a newly-assigned foster-care worker, reported that there

had been "multiple" Children's Protective Services (CPS) allegations made against respondent involving allegations of physical abuse against both children. This included a total of 12 complaints in the preceding year. Because of safety concerns, MDHHS moved the visits back to being supervised by MDHHS and Catholic Charities, an agency.

In May 2019, MDHHS filed a second supplemental petition, again seeking to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). In relevant part, it alleged that respondent failed to benefit from the updated case service plan regarding parenting and anger management, as demonstrated by his continued use of physical discipline and times when he "lost his temper" with the children. Citing the CPS complaints against respondent, MDHHS alleged it had "serious concerns" about respondent's parenting skills. Asserting that respondent failed to rectify the parenting-skills and anger-management issues that led to adjudication, MDHHS also alleged that the children faced a risk of harm if returned to respondent's care.

The termination hearings in this case were held over 20 days, beginning in August 2019 and ending in February 2020. In late November 2020, the trial court issued an 85-page written opinion regarding termination of respondent's parental rights. Regarding reunification efforts, the trial court concluded that MDHHS fulfilled its obligation to make reasonable efforts. Rejecting respondent's contention that the caseworkers failed to make reasonable efforts because they were biased against him, the court instead found that respondent had failed to benefit from those efforts. The trial court declined to terminate respondent's parental rights under MCL 712A.19b(3)(g) because MDHHS failed to present any evidence regarding respondent's financial ability to provide care and custody for the children.[3] Nevertheless, the trial court found statutory grounds for termination under MCL 712A.19b(3)(c)(*i*) and (j). The trial court also concluded that termination was in the children's best interests. Later, in December 2020, the trial court entered a separate order, terminating respondent's rights to both children.[4]

In February 2021, respondent appealed to this Court by delayed leave granted, and a panel of this Court affirmed the termination of respondent's parental rights. See *In re Bourbeau*, unpublished per curiam opinion of the Court of Appeals, issued October 14, 2021 (Docket No. 356222), vacated and remanded by 969 NW2d 344 (Mich, 2022). Proceeding *in propria persona*, respondent sought leave to appeal in the Michigan Supreme Court. The Supreme Court determined that respondent was denied the effective assistance of appellate counsel during his previous appeal, and in lieu of granting leave, the Supreme Court vacated this Court's judgment and remanded to this Court for a "new appeal." *In re Bourbeau*, 969 NW2d 344 (Mich, 2022). The case is now before us again for the new appeal ordered by the Supreme Court.

---

[3] Under MCL 712A.19b(3)(g), a trial court may terminate parental rights when "[t]he parent, although, in the court's discretion, *financially able to do so*, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." (Emphasis added.)

[4] The trial judge who terminated respondent's parental rights in 2020 was not the same judge who denied termination in 2017. The case was assigned to multiple judges and referees over the course of these lengthy proceedings.

## II. STANDARDS OF REVIEW

This Court reviews for clear error a trial court's decision whether reasonable efforts were made. *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021). We also review for clear error the trial court's decision that statutory grounds for termination have been proven by clear and convincing evidence, as well as its determination that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. "This Court gives deference to a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App at 40. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). If there are multiple children, and "if the best interests of the individual children *significantly* differ," the trial court should address the children's best interests individually. *In re White*, 303 Mich App 701, 715; 846 NW2d 61 (2014) (emphasis in original).

Unpreserved issues, on the other hand, "are reviewed for plain error affecting substantial rights." *In re Sanborn*, 337 Mich App at 258 (quotation marks and citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings. *Id*. (quotation marks and citation omitted).

## III. REASONABLE EFFORTS

On appeal, respondent argues that the trial court clearly erred by concluding that MDHHS fulfilled its obligation to make reasonable efforts to reunify respondent with his children. We disagree.

## A. LEGAL STANDARDS FOR REASONABLE EFFORTS

Absent certain aggravated circumstances not at issue in this case, MDHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). See also MCL 712A.19a(2). Federal law similarly requires states to "make reasonable efforts . . . to preserve and unify families in order both to prevent a child's removal from his home and to make

it possible for the child to safely return to his home."[5] *In re Rood*, 483 Mich 73, 104; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.) (quotation marks and citations omitted). As part of its reasonable efforts, MDHHS is required to "create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich at 85-86. See also MCL 712A.18f(3)(b) and (c). The plan must set forth a "[s]chedule of services to be provided to the parent, child, and if the child is to be placed in foster care, the foster parent, to facilitate the child's return to his or her home or to facilitate the child's permanent placement." MCL 712A.18f(3)(d). MDHHS must prepare an initial case service plan "no later than 30 days after the [child's] placement." MCR 3.965(D)(1). See also MCL 712A.13a(10)(a). "If a child continues in placement outside of the child's home, the case service plan shall be updated and revised at 90-day intervals . . . ." MCL 712A.18f(5).

It is not, however, enough for MDHHS to simply prepare and update case service plans. MDHHS and the trial court must ensure that a parent has a "*meaningful* opportunity to comply with a case service plan." *In re Mason*, 486 Mich 142, 169; 782 NW2d 747 (2010) (emphasis added). If MDHHS fails to make reasonable efforts, termination of a parental rights will be premature. *Id*. At the same time, although MDHHS must "expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

B. CASE SERVICE PLANS

Respondent raises several challenges to the efforts made by MDHHS in this case. First, respondent contests whether MDHHS fulfilled its obligation to prepare an initial case service plan and to update that plan. More specifically, respondent notes that an initial case service plan does not appear in the confidential file in this case and that the confidential file does not contain all the updated case services plans that should have been prepared during the pendency of this case. Although there are some subsequent plans in the record, respondent notes potential problems, such as missing signatures from the plans, and respondent appears to challenge whether the updated plans were duly presented to the trial court in 90-day intervals. This issue is unpreserved because respondent failed to raise it in the trial court. See *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 358502 and 358503); slip op at 2.

---

[5] As emphasized by respondent on appeal, in 2006, a class action was filed in federal court, alleging systemic deficiencies in Michigan's child-welfare practices. See *Dwayne B v Granholm*, Case No 2:06–CV–13548 (ED Mich), filed August 8, 2006. That lawsuit resulted in a settlement, approved by the federal district court in 2008, to "advance the public interest by reforming and improving the foster care system in Michigan." *Dwayne B v Granholm*, opinion of the United States District Court for the Eastern District of Michigan, issued October 24, 2008 (Case No. 06-13548). That settlement agreement has since been modified, and monitoring of Michigan's foster-care program pursuant to the *Dwayne B* agreement remains ongoing. See State of Michigan, *Child Welfare Reform* <https://www.michigan.gov/mdhhs/inside-mdhhs/legal/child-welfare-reform> (accessed December 1, 2022).

Respondent is correct that the confidential file in this case does not contain all the case service plans that it should.[6] That said, respondent's claims of error relating to the missing case service plans are unpreserved, and respondent has not shown plain error affecting his substantial rights. Despite the absence of early case service plans from the record, the possibility of poor recordkeeping, and other potential irregularities in the record,[7] the record nevertheless supports that respondent was provided with case service plans and that, ultimately, respondent was aware of his obligations under the case service plans.

The court repeatedly addressed requirements for the case service plans on the record with respondent present during the hearings throughout the case, beginning with adoption of the initial plan at the initial dispositional hearing in 2015. The record contains written case service plans signed by respondent, beginning in May 2018. And, in January 2020, during his testimony at the termination hearing, respondent acknowledged that he received case service plans from caseworkers throughout the case, including from Shelby Berkowski, who handled the case early on, and later from Bach, who took over the case in 2018. Respondent specifically acknowledged receiving and signing the initial case service plan. He also testified that, beginning in 2015, he participated in services required in the plans, including therapy, parenting classes, and drug testing. Overall, although there are written plans missing from the record, the court informed respondent of his obligations under the case service plans and he participated in services as required by those plans. Respondent, therefore, has not satisfied the plain-error standard for this unpreserved claim, because he has not established that an error occurred.

---

[6] MDHHS concedes that plans from 2015 through early 2017 are missing from the record. It attempts to explain this omission by asserting that there was "an issue" during a "paper-to-electronic recordkeeping transition" and that the plans exist somewhere in paper form. MDHHS has not, however, provided this Court with any paper records to support this assertion, and there is no evidence in the electronic record that has been presented for this Court's review to support that all the plans were properly included in the confidential file. See MCR 7.210(A) ("Appeals to the Court of Appeals are heard on the original record."). The only plan MDHHS identifies as having been added to the electronic file at some point is what MDHHS asserts was the initial case service plan in this case, signed by an MDHHS supervisor on September 2, 2015. If this is the only initial case service plan, then it is facially lacking as it lists CMB as the only child and includes no discussion of AJB whatsoever. Regardless, as MDHHS concedes, there are numerous missing updated plans, and the initial plan relating to CMB does not cure these numerous defects. In short, MDHHS's "paper-to-electronic recordkeeping" explanation for the missing documents is not supported by the record.

[7] There are, for example, plans on which respondent's signature does not appear. See *In re Mason*, 486 Mich at 156-157 & n 8 (discussing procedures in the Michigan Foster Care Manual regarding parent's signatures and noting the conspicuous absence of the respondent's signature from the case service plan).

### 1. LEGITIMATE EFFORTS TOWARD REUNIFICATION

Respondent also challenges the adequacy of the services provided by MDHHS. He generally asserts that the services were not "legitimate" or "actual." i.e., he appears to challenge the sincerity of MDHHS's efforts and whether it truly had reunification in mind as the goal of the case.[8] He broadly characterizes Michigan's foster-care system as "despicable and uncaring, dangerous, and destructive of birth families," and he contends that MDHHS could not "tolerate" respondent's progress in this case, choosing instead to scrutinize respondent "to the point of absurdity" and to hold respondent to a "ridiculously high standard" with the aim of terminating his rights. In the trial court, respondent presented evidence and argument to support this assertion. For example, in his testimony, he described a lack of communication from MDHHS and his frustration at not receiving more parenting time. He also discussed his sense of being judged and criticized during parenting time rather than helped and advised, as well as the camaraderie he saw between the caseworkers and the foster parents. Respondent also described comments by the foster parents, and even caseworkers, suggesting that the goal in this case—from the outset—was adoption and not reunification of the children with respondent. According to respondent's testimony, one of the caseworkers involved with the case early in the proceedings openly told respondent that she could not wait for his rights to be terminated.

The trial court chose not to credit respondent's testimony and rejected his theory that MDHHS was biased against him. The trial court chose instead to credit the testimony of caseworkers who asserted that they offered respondent "all reasonable services," which included parenting time, therapy, family therapy, and parenting classes. Deferring to the trial court's credibility assessment, see *In re TK*, 306 Mich App at 710, as we must, respondent has not shown clear error on this basis.

Apart from his contention that MDHHS did not make legitimate efforts toward reunification, respondent identifies a few specific areas in which he believes MDHHS failed to make reasonable efforts. We address each in turn.

### 2. TRANSPORTATION ASSISTANCE

First, respondent asserts that MDHHS did not provide him transportation assistance. In this regard, respondent testified at the January 13, 2020 termination hearing that MDHHS provided transportation assistance for AJB's foster parents, i.e., MDHHS transported AJB to visits. But, according to respondent, MDHHS did not offer respondent transportation assistance, meaning that if he had car trouble or issues with transportation, his visits were canceled unless he came up with his own backup plan. This issue, which respondent did not raise until the termination hearing, is

---

[8] Unlike most of respondent's challenges to MDHHS's efforts, this issue was raised by respondent in the trial court; it was respondent's theory of the case, beginning early in the proceedings, that MDHHS was not actually attempting to engage respondent in services. This issue is preserved. See *In re Atchley*, ___ Mich App at ___; slip op at 2.

unpreserved because respondent failed to raise it in a timely manner, see *In re Atchley*, ___ Mich App at ___; slip op at 2, and respondent has not shown plain error.

From the record, it is not clear that respondent actually needed transportation assistance. Based on respondent's testimony, it appears that he had a car, and he attended the majority of parenting-time visits and other services in this case, suggesting that transportation was not an obstacle for him. Although anyone can have car trouble, a mere possibility of car trouble does not mean that the respondent needed transportation assistance. Moreover, even if MDHHS was remiss in failing to aid respondent with transportation, given that respondent in fact attended almost all the visits and services in this case, he has not shown that transportation assistance would have allowed him to fair better. See *In re Sanborn*, 337 Mich App at 264. Accordingly, respondent cannot show plain error on this basis.

### 3. INCLUSION IN CHILDREN'S APPOINTMENTS

Second, respondent is not entitled to relief on the basis that MDHHS failed to include him on appointments for the children. Respondent raised this issue at a hearing on May 16, 2018, when his attorney asked that respondent be allowed to attend appointments, such as medical and dental visits, for the children. MDHHS did not object, and the trial court stated that respondent should be given the details about appointments. In short, the issue was raised in the trial court and resolved in respondent's favor. Respondent did not thereafter challenge MDHHS's efforts to keep respondent apprised of the children's appointments, and he offered no evidence that MDHHS failed to include him. To the contrary, according to AJB's foster mother, respondent was invited to attend AJB's medical appointments, dental appointments, and school meetings. Except for one school meeting, respondent did not attend these events. The credibility of this testimony was for the trial court to decide. See *In re TK*, 306 Mich App at 710. And, the record does not support respondent's claim that he was denied information about the children's appointments, nor has he shown that MDHHS failed to make reasonable efforts on this basis.

### 4. MEDICAL EVALUATIONS

Third, respondent argues that MDHHS failed to obtain appropriate medical evaluations for the children to address various issues, including the children's attention deficit hyperactivity disorder (ADHD) diagnoses, possible autism, AJB's extreme aggression and post-traumatic stress disorder (PTSD) diagnosis, and attachment disorder diagnoses. According to respondent, the social workers and other providers who testified were unqualified to meet the children's needs, and MDHHS should have instead sought medical intervention. Respondent failed to timely raise this issue in the trial court, so the issue is unpreserved. See *In re Atchley*, ___ Mich App at ___; slip op at 2. Respondent has not shown plain error on this basis.

As part of reasonable efforts, MDHHS must provide services to the parent and the child to facilitate the child's return to the home. See MCL 712A.18f(3)(d).[9] In this case, MDHHS

---

[9] See also MCL 712A.18(1)(f) (recognizing the trial court's authority to order "medical, dental, surgical, or other health care" during the dispositional phase of proceedings); MCL 722.958b(3)(i)

presented evidence that the children received appropriate medical care, dental care, and psychological services, including services to address the children's diagnoses and aggression. Respondent now claims those services were inadequate. There is, however, nothing in the record to support that services that should have been offered to the children were denied them or that, had additional services been offered, respondent would have fared better in his efforts toward reunification. See *In re Sanborn*, 337 Mich App at 264. In short, respondent has not shown plain error regarding this issue.

## 5. PRINCIPLES OF "PLACEMENT" AND "SERVICES"

Lastly, respondent cites two "principles" from the modified settlement in *Dwayne B v Granholm*, Case No 2:06–CV–13548 (ED Mich), filed August 8, 2006, which respondent asserts MDHHS violated in this case. The principles—which according to the settlement should guide the interpretation of the agreement—relate to the placement of children and the necessity of tailoring services to meet a family's unique needs.[10] Although respondent cites these provisions, his argument regarding their significance in this case is not particularly well developed. To the extent that respondent again challenges the services provided, as already discussed, the trial court did not clearly err by concluding that MDHHS made reasonable efforts. Respondent has not shown

---

(requiring MDHHS to provide quality care to children in foster care, which must include "[a]ccess to and receipt of information and services, including necessary medical, emotional, psychological, psychiatric, and educational evaluations and treatment, as soon as practicable after identifying the need for services by the screening and assessment process.").

[10] More fully, the principles cited by respondent state:

> D. *Placement*: The ideal place for children is in their own home with their own family. When [MDHHS] cannot ensure their safety in the family home, it must place children in the most family-like and least restrictive setting required to meet their unique needs and must place siblings together whenever possible. [MDHHS] must strive to make the first placement the best and only placement.

> \* \* \*

> F. *Services*: When [MDHHS] intervenes on behalf of children it must strive to leave children and families better off than if there had been no intervention. [MDHHS] must tailor services to meet the unique needs of each family member and provide those services in a manner that is respectful of the child and the family. Services should be outcome-based, data-driven, and continuously evaluated.

The modified settlement can be found online at Michigan, *Child Welfare Reform*, Modified Settlement Agreement & Court Order <https://www.michigan.gov/mdhhs/-/media/Project/Websites/mdhhs/Inside-MDHHS/Legal/Modified_Settlement_Agreement__Consent_Order.pdf?rev=9d91af1a98094232 84f55070fc4161d2&hash=A83B82F5169A77FDE1CFC1DE2845D5A1> (accessed December 1, 2022).

plain error regarding services that he now claims could have been provided because he cannot establish that he would have fared better. See *In re Sanborn*, 337 Mich App at 264.

Regarding the children's placement, respondent appears to argue that MDHHS failed in its responsibilities by not placing the children together. Respondent did not challenge the children's placement on this basis in the trial court. The issue is, therefore, also unpreserved, see *In re Atchley*, ___ Mich App at ___; slip op at 2. Respondent has not satisfied the plain error standard because he has not shown that the trial court erred, let alone made a clear error. By statute, reasonable efforts must be made to place siblings removed from the home together unless "joint placement would be contrary to the safety or well-being of any of the siblings." MCL 712A.13a(14)(a). It is clear from the early proceedings that the children were placed separately because AJB, who had already injured CMB, posed a danger to CMB, and the maternal grandmother with whom CMB had been living almost since his birth did not believe that she could handle both children. Further, because of his aggressive behavior toward other children, AJB had to be moved several times until he was ultimately placed in a foster home without other children in the home. Respondent has not satisfied the plain error standard because he has not established that the court made an error with the children's separate placements.

In sum, respondent has not shown that the trial court clearly erred by concluding that MDHHS made reasonable efforts toward reunification.

IV. STATUTORY GROUND UNDER MCL 712A.19B(3)(C)(i)

Respondent also argues that the trial court clearly erred by concluding that clear and convincing evidence supported termination of his rights under MCL 712A.19b(3)(c)(*i*). We disagree. The trial court did not clearly err in finding clear and convincing evidence supporting termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*). We acknowledge that the court referenced "concerning," but unsubstantiated CPS complaints. But ultimately the court did not rely on those complaints. We also acknowledge that, when viewed in isolation, certain of MDHHS and the court's criticisms of respondent's parenting style and discipline could be attributed to "less than ideal" parenting, not warranting termination. But these incidents did not occur in a silo. The court viewed them, as it should, in the context of respondent's five-year-long case. In that context, we do not find that the court clearly erred in finding that the conditions that led to adjudication continued to exist with no reasonable likelihood of rectification. See MCL 712A.13)(c)(*i*).

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App at 80. Only one statutory ground need be established to support the termination of parental rights. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). The trial court terminated respondent's parental rights, in part, under MCL 712A.19b(3)(c)(*i*), which states:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Termination is appropriate under MCL 712A.19b(3)(c)(*i*) "when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services." *In re White*, 303 Mich App at 710 (quotation marks, citation, and alteration omitted).

Here, the trial court did not clearly err by finding statutory grounds for termination under MCL 712A.19b(3)(c)(*i*). The trial court identified the conditions leading to adjudication as (1) domestic violence between respondent and MB; (2) physical and verbal abuse of AJB; (3) failure to properly supervise CMB, leading to him being injured by AJB; and (4) failure to provide "support" and "appropriate care" in a "safe environment" for CMB. It concluded that respondent failed to rectify these conditions and would be unable to do so in a reasonable time. The trial court found that respondent posed a risk of physical and emotional harm to the children because he physically abused and yelled at them.

The trial court made factual findings regarding three specific incidents of physical abuse that supported its conclusion that respondent failed to rectify the conditions leading to adjudication. First, it relied on a September 2018 incident when respondent pushed AJB's knee into his face while putting on a shoe. Although there was testimony that is may have been an accident, the court found that the shoe incident involved a deliberate instance of physical abuse perpetrated by respondent. We defer to the trial court's credibility determinations, see *In re TK*, 306 Mich App at 710, that this constituted an instance of deliberate physical abuse, committed by respondent despite years of services and parenting classes. The trial court credited AJB's hearsay statements about the incident, as recounted by a caseworker, AJB's therapist, and AJB's foster mother.[11] AJB told these individuals that, while putting on AJB's shoe, respondent pushed AJB's knee into his face. AJB also told his therapist that respondent did this "on purpose." And AJB had a mark on his face.

The second incident of physical abuse supporting the court's finding, involved respondent hitting CMB on his head causing CMB to fall to his knees in either late 2018 or early 2019. The trial court credited hearsay statements made by CMB to Bach. According to Bach's description of CMB's statements to Bach, respondent "hit" CMB on the head, CMB fell to his knees, and it "really hurt." Respondent also yelled at AJB and CMB during this incident. Although the details about the incident are sparse, the trial court found this hearsay credible. This constitutes a second instance of physical abuse, committed by respondent even after years of services and parenting classes.

---

[11] With limited exceptions, hearsay evidence may be admitted at a dispositional hearing when it is based on the same statutory grounds that led to jurisdiction. See *In re Mota*, 334 Mich App 300, 312-313; 964 NW2d 881 (2020) ("Unlike the adjudicative [trial], at the initial dispositional hearing the respondent is not entitled to a jury determination of the facts and generally, the Rules of Evidence do not apply, so all relevant and material evidence is admissible.").

-11-

Finally, in July 2018, respondent yelled and swore at the children after CMB got out of his car seat while the vehicle was moving. Respondent's girlfriend, who supervised respondent's visit at the time, did not testify at the termination hearing. She reported the incident to Bach, who testified. According to these hearsay statements, respondent pulled the vehicle to the side of the road, and then yelled and swore at the children. The girlfriend reported being "scared." Respondent testified, and offered supporting testimony from Dr. Eisenstadt, that the incident constituted nothing more than normal anger and fear by a parent in an emotional situation that arose when CMB got out of his car seat in a moving car. Respondent is correct that yelling, and even swearing, by a parent does not necessarily mean that a parent is unfit to care for his or her children. See *In re Kellogg*, 331 Mich App at 256 ("A parent that yells and swears at his or her child, stands over them, and invades their personal space can fairly be characterized as a less than ideal parent. But that fact standing alone does not prove a parent's unfitness . . . ."). But, the trial court rejected this explanation for the incident, choosing instead to view the incident as a "frightening" "verbal altercation," involving "hostile conduct" by respondent. Deferring to the trial court's assessment of witness credibility and weight of the evidence, see *In re TK*, 306 Mich App at 710, the July 2018 incident is reminiscent of incidents leading to the adjudication, including a 2015 audio recording made by MB, in which respondent yelled at AJB. Despite years of services, respondent has not addressed the anger-management and domestic-violence issues that led to the adjudication. The relatively recent occurrence of these three incidents—during times when respondent was not being supervised by MDHHS or Catholic Charities—support the trial court's conclusion that respondent has not fully rectified his anger-management, domestic-violence, and abuse concerns that led to the adjudication, despite years of services.

Given the length of time this case has been pending—over five years—the trial court also did not clearly err by concluding that there is no reasonable likelihood that the conditions would be rectified within a reasonable time considering the children's ages. See MCL 712A.19b(3)(c)(*i*). The trial court's finding, that respondent had ample time to "demonstrate meaningful progress on correcting the conditions that led to adjudication regarding each child and has not done so," was supported by ample evidence. AJB and CMB were in foster care for over five years and the testimony showed that, in that time, respondent failed to benefit from the various services offered to him. Termination is appropriate in such circumstances. See *In re White*, 303 Mich App at 710 (indicating that termination is appropriate under MCL 712A.19b(3)(c)(*i*) "when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services.").

We are not persuaded by respondent's arguments that the trial court relied on improper factors and faulty proofs from MDHHS. Respondent claims that the trial court (1) improperly relied on unsubstantiated CPS complaints, (2) held respondent's parenting skills to an unfair and impossible standard, and (3) improperly relied on his corporal punishment as a basis for termination. We address each of these claims.

First, we acknowledge that MDHHS noted that there were 11 CPS complaints against respondent, which the trial court characterized as "concerning." The court may not rely on unproven allegations as a basis to terminate parental rights. See *In re Jackisch/Stamm-Jackisch*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357001); slip op at 5. And, here, the court did not rely on those allegations. It expressed concern, but made specific factual findings and credibility determinations about the three relatively recent incidents of abuse described above.

Second, respondent argues that MDHHS held him to an unfair and perfecting standard, nitpicking his parenting technique for isolated incidents of failing to bring food to visitations, needing to be prompted to discipline the children, disciplining the children too often and too harshly, and using overly complicated language with the children. Respondent is correct that a parent's rights cannot be terminated simply because he or she is "less than ideal." See *In re Newman*, 189 Mich App 61, 70; 472 NW2d 38 (1991) ("Respondents are less than ideal parents. But this is not a perfect world."). But the court did not appear to rely on these matters when finding statutory grounds.

Third, respondent claims that he was punished for MDHHS's unsupported claims that he spanked the children during unsupervised visits. We acknowledge that the law permits parents to use "reasonable force" to discipline a child. See MCL 750.136b(9) (stating that prohibitions on child abuse did not prohibit parents and guardians from disciplining children, including "the use of reasonable force"). Here, however, the trial court did not rely on unsupported claims or "reasonable" spankings. It made specific findings regarding incidents of physical and verbal abuse that occurred after years of attempting to rectify respondent's issues.

The evidence supporting the court's findings for the statutory grounds did not occur in a vacuum. Rather, they occurred in the context of respondent's years-long history with the trial court and numerous unsuccessful attempts at correction and reunification. Deferring to the trial court's determinations regarding credibility and the weight of the evidence, the trial court did not clearly err by finding clear and convincing evidence supported termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*).[12]

## V. BEST INTERESTS

Lastly, respondent argues that the trial court clearly erred by concluding that termination was in the children's best interests. According to respondent, the children are bonded to him, and their best interests will not be served by adoption and severing their bond with respondent, particularly when they are not in the same foster placement. We disagree.

In determining a child's best interests, the trial court should also weigh all the available evidence and consider a wide variety of factors, including the child's bond to the parent, the parent's parenting skills, and the child's need for permanence, stability, and finality. *In re White*, 303 Mich App at 713. The possibility of adoption[13] and the advantages of a foster home over the

---

[12] Given our conclusion that the trial court did not clearly err in finding that clear and convincing evidence supported termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), we need address respondent's arguments regarding MCL 712A.19b(3)(j). See *In re Ellis*, 294 Mich App at 32.

[13] On appeal, respondent argues that this Court should reevaluate caselaw, including *In re White*, 303 Mich App at 713-714, which respondent characterizes as "rubber-stamping" best-interest findings in cases involving a possibility of adoption. Contrary to respondent's arguments, this precedent merely identifies the possibility of adoption as one of several relevant factors the trial court should consider when evaluating a child's best interests.

parent's home may also be considered. *Id.* at 713-714. Other relevant factors include a parent's history of domestic violence or abuse and concerns for a child's safety and well-being if returned to the parent's care. See *id.*; *In re VanDalen*, 293 Mich App 120, 141; 809 NW2d 412 (2011). A child's placement with a relative weighs against termination under MCL 712A.19a(8)(a), and a relative placement is a fact that must be considered when analyzing a child's best interests. *In re Olive/Metts Minors*, 297 Mich App at 43. Ultimately, the focus of the best-interest analysis is the child, not the parent. *In re Moss*, 301 Mich App at 87.

Here, the trial court addressed AJB's and CMB's best interests, considering the relevant factors. First, although there was conflicting evidence regarding the strength of the children's bond with respondent, the trial court credited testimony that AJB had a "very weak bond" with respondent and that CMB had "little to no bond" with respondent. Deferring to the trial court's determinations regarding the weight and credibility of the evidence, the trial court did not clearly err in its evaluation of the children's respective bonds with respondent.

The trial court also found that both children needed permanency, stability, and finality, which their respective placements were willing to provide. Regarding AJB, the court credited testimony that from various witnesses indicating that termination of respondent's parental rights was in AJB's best interests. It noted the testimony of Kathy Spatafore, an expert in clinical psychology who conducted psychological evaluations on children and adults in cases involving neglect and abuse, who testified that removing AJB from his foster home would be detrimental to him. It also found that several witnesses "convincingly testified" that AJB "thrived" in his foster home. Further, the trial court found that because AJB "suffer[ed] from severe emotional and behavioral issues which require[] above-and-beyond attentive, hands-on, assistance," he "need[ed] to be placed in an environment which addresses his concerning behavior and assists him in overcoming or managing his special needs." It determined that his foster home "provided the most stable and consistent home environment [he] ha[d] ever known." Regarding CMB, the court noted testimony that he was in "critical need" of permanence and removal from his placement with his maternal grandmother would be "absolutely detrimental to him." It also noted CMB's special emotional needs and his ADHD diagnosis. The court indicated that CMB required a caregiver who could address these unique needs, as his maternal grandmother had done so his entire life. We conclude that the trial court's findings regarding the children's need for permanency, stability, and finality, were supported by a preponderance of the evidence.

The trial court also noted that respondent had a history of domestic violence, and the trial court found that respondent continued to demonstrate "physical aggression" "through his deficient parenting skills." The trial court's findings are supported by the two instances of physical abuse and the incident when respondent yelled at the children in the car. According to the trial court's findings, the children were well cared for in their respective placements, and the children were bonded to their caregivers. Further, the caregivers were interested in adoption. Unlike AJB, CMB was placed with a relative—his maternal grandmother. The trial court expressly considered this relative placement, but found that it did not outweigh the other factors supporting termination, particularly when CMB was bonded to his grandmother as his primary caregiver, he needed permanency, and respondent had a "very strained" relationship with the grandmother. Although respondent disagrees with the trial court's findings and presented evidence to support his belief that termination was not in the children's best interests, this Court defers to "a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear

-14-

before it." *In re TK*, 306 Mich App at 710.  In doing so, we conclude that the trial court did not clearly err by concluding that termination of respondent's rights was in the children's best interests.

  We affirm.


            /s/ Noah P. Hood
            /s/ Brock A. Swartzle
            /s/ James Robert Redford