*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* D.T. REEVES, Minor.

UNPUBLISHED
June 12, 2026
9:06 AM

No. 379090
Kalamazoo Circuit Court
Family Division
LC No. 2024-000003-NA

Before: BAZZI, P.J., and RICK and MALDONADO, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court order terminating her parental rights to the minor child, DTR, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), and (j) (reasonable likelihood that child will be harmed if returned to parent).[1] We affirm.

## I. BACKGROUND

At approximately 3:30 a.m. on December 31, 2023, respondent and DTR went to Bronson Methodist Hospital in Kalamazoo, Michigan. Respondent and DTR had been kicked out of the homeless shelter they had been staying at, although respondent claimed that she left voluntarily. The nurse who treated respondent and DTR at the hospital, testified that they "came in for cough and cold-like symptoms," but "there [were] no signs of any distress." Although respondent disputes what happened at the hospital, a Children's Protective Services (CPS) worker through the Michigan Department of Health and Human Services (DHHS), testified that respondent asked for pain medication and became "non-cooperative" and "aggressive" when the hospital did not provide it. Further, when hospital staff brought up concerns for DTR, including that she was

---

[1] The trial court also terminated the parental rights of the respondent-father on the ground that he deserted DTR for 91 or more days and had not sought custody of DTR during that time period. See MCL 712A.19b(3)(a)(*ii*). He is not a party to this appeal.

"small for her age and there were concerns for malnourishment," respondent would not allow hospital staff to take DTR's vitals or perform any tests.

The CPS worker tried to assist respondent with finding shelter for the following night but was unsuccessful. During her time with respondent, the CPS worker also noticed that there were times that respondent was talking to someone, but there was no one there. The CPS worker informed respondent that if they could not find a safe place for respondent and DTR to stay that it may lead to removal of DTR. Respondent became upset but when the time for removal came, respondent could not remember the conversation about possible removal. The DHHS petitioned for an ex parte order of removal of DTR from respondent's care, which the trial court granted. During DTR's removal, respondent tried to push past the police officer assisting with removal and DTR hit her head on a doorframe. Respondent and the officer fell to the ground, and respondent hit the officer. During the scuffle, the CPS worker intervened to release respondent's grasp and secure DTR. DTR was taken to the hospital for an evaluation because she hit her head "pretty hard." After removal, respondent was arrested.

At the preliminary hearing, the CPS worker affirmed that her recommendation for removal was based on "lack of shelter, uncooperative behavior, kind of erratic behavior . . . the housing issue, and that there was no shelter willing to accept mother and child at" the time of removal. Throughout the proceedings, petitioner provided services to respondent, including a psychological evaluation and mental health services; housing, childcare, and disability services; and assistance in finding employment.

At the first few review hearings, DHHS caseworker Caroline Cairns testified that parenting time was going well and there were no significant concerns. Respondent remained at a homeless shelter but had found employment at a fast-food restaurant. Cairns testified that the DHHS "would like to see consistency and improvement in [respondent's] mental health and well-being," highlighting an incident in which respondent indicated she experienced hallucinations and paranoia. Respondent completed a psychological evaluation, which recommended that she be on her medication for at least six months before beginning unsupervised visits. DTR's advocate through Disability Network Southwest Michigan, reported that respondent was "actively participating" in disability and psychological services.

However, in October 2024, the trial court held a review hearing at which respondent appeared virtually because she was incarcerated for trespassing at a homeless shelter after being kicked out. Caseworker Cairns reported that respondent was participating in counseling through Integrated Services of Kalamazoo (ISK) and consistently taking her prescribed medication. ISK diagnosed respondent with post-traumatic stress disorder and anxiety, but the DHHS was seeking further diagnostic evaluations because of a belief that respondent's behavior was inconsistent with that diagnosis. Cairns testified that respondent frequently became "escalated" during parenting times, becoming threatening and using profanity. Cairns reported a concern that respondent became so agitated that she was unable to meet DTR's needs and that her behavior worsened since the last reporting period.

Respondent's concerning behaviors continued throughout 2025. Just before the January 2025 permanency planning hearing, law enforcement arrested respondent and charged her with retail fraud, malicious destruction of property, and disturbing the peace. Caseworker Cairns

expressed concern for respondent's decision-making skills and testified that respondent missed six parenting visits because of her incarceration. Cairns again testified that respondent was engaging in services for her mental health, but during parenting time she continued to use profanity, yell, scream, and occasionally throw objects in the direction of DHHS staff. Cairns testified that respondent's behavior during case meetings and parenting times resulted in her not engaging with DTR and isolating herself to regulate her emotions. In June 2025, law enforcement charged respondent with retail fraud after an incident at a local grocery store. By July 2025, respondent was fired from her job, her dog was removed by animal services "due to concerns of abuse and neglect within the home," and respondent tested positive for methamphetamine.

At the conclusion of the July 2025 review hearing, the trial court changed the goal to termination, noting that "[t]o be at a case from December of 2023 and not even be to unsupervised parenting time, let alone supervised at a public place, we're just not getting where we need to be." In September, following the goal change and the filing of a petition to terminate respondent's parental rights, a review hearing was held at which caseworker Cairns testified that respondent had been incarcerated in August after becoming "escalated" while completing a randomized drug screen and causing property damage by "taking things off of the walls." Respondent denied the charges. During the reporting period, respondent also tested positive for THC,[2] amphetamine, methamphetamine, and psychedelics. The trial court noted that it was concerned with the positive tests for methamphetamine, not THC.

In November 2025, a few weeks after the first day of the termination trial, respondent left a note at the police station stating: "First start of a plan that's soon to unfold. You took something you didn't own. Price for that? Price to pay?" At a parenting time held later that day, at the DHHS office, respondent "arrived extremely escalated, yelling, giving staff the middle finger, and banging on [the DHHS's] walls, doors, and windows." During the visit, respondent asked DTR about her foster home's "layout, names, and what the child sees from the window." Respondent "was twice warned to de-escalate, which she did not do." Security intervened and the police were called, but respondent refused to return DTR to the DHHS when police arrived.

At the conclusion of the termination trial in December 2025, the trial court terminated respondent's parental rights, stating that the conditions that led to adjudication, including respondent's lack of appropriate housing, emotional instability, and "escalated" behaviors, continued to exist and had not been rectified despite reasonable notice and opportunity. The trial court found that respondent's behavior was likely to harm DTR if she was returned to respondent's care and concluded that termination was in DTR's best interests. Respondent now appeals.

## II. STANDARDS OF REVIEW

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Once a statutory ground

---

[2] "Tetrahydrocannabinol, or THC, is the physiologically active component of marijuana. See *Stedman's Medical Dictionary* (26th ed), p 1791." *People v Koon*, 494 Mich 1, 3 n 3; 832 NW2d 724 (2013).

for termination is established, the trial court must determine whether termination is in the child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App 713, 733; 858 NW2d 143 (2014).

"We review for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and . . . the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000), superseded in part by statute as observed in *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

## III. ANALYSIS

### A. STATUTORY GROUNDS

In this case, the trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j). Respondent argues that the trial court erred by determining that statutory grounds existed to terminate her parental rights because there was no evidence that DTR would be harmed if returned to respondent's care, and she had rectified the barriers to reunification by obtaining housing, employment, regular income, and participating in mental health treatment. We disagree.

### 1. CONDITIONS CONTINUE TO EXIST

For termination of parental rights to be proper under MCL 712A.19b(3)(c)(*i*), 182 or more days must have elapsed since the initial dispositional order, the conditions leading to adjudication must continue to exist, and there must be "no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Similarly, termination of parental rights is proper under MCL 712A.19b(3)(c)(*ii*) when other conditions exist that caused the children to come within the court's jurisdiction, and the parent has not rectified those conditions despite receiving recommendations, reasonable time, and reasonable opportunity to rectify the conditions.

We have held that termination is appropriate when "the totality of the evidence" supported a finding that there was not "any meaningful change in the conditions" that led to adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). "While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in" and "demonstrate that they sufficiently benefited from" services that are offered. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

Respondent admits that she would not earn a "gold medal" for her parenting, but argues that is not a requirement in order to provide "proper care and custody." Respondent relies on *In re Newman*, 189 Mich App 61; 472 NW2d 38 (1991). In *In re Newman*, 189 Mich App at 62, this Court reversed the trial court's decision to terminate parental rights. The DHHS had petitioned for termination on the basis of "allegations ranging from inadequate or improper care and supervision of the children during the respondents' visits to dirty, unsanitary conditions in the

home and unsatisfactory compliance with court-ordered counseling . . . ." *Id*. at 63-64. This Court held that the trial court erred by finding the conditions in the home supported a statutory ground for termination "because respondents were not given a full and fair opportunity to maintain the home." *Id*. at 67.

But, unlike in *In re Newman*, respondent was given a full and fair opportunity to rectify the conditions that led to adjudication and failed to do so. In the present case, the initial disposition order was filed in April 2024, and the termination trial began in October 2025—576 days later. There is no dispute that 182 days had elapsed since the initial dispositional order for purposes of (3)(c)(*i*) and (c)(*ii*).

The trial court found that the primary condition that led to removal was respondent being unable to provide a proper home for DTR and that respondent still could not do so at the time of trial. The trial court acknowledged that respondent was no longer homeless but found that she could not provide a safe or clean home for DTR. The record supports the trial court's findings. In December 2023, the DHHS petitioned for removal of DTR because respondent and DTR had been kicked out of the homeless shelter where they were staying and did not have a safe place to stay. At the January 2025 review hearing, the caseworker reported that respondent had moved into a two-bedroom apartment, but there were immediately concerns about the cleanliness of the home. Shortly after respondent moved in, the caseworker noticed a dog in the apartment; the caseworker saw the dog "urinate on the carpet" and respondent not adequately cleaning up. The caseworker also observed respondent "hitting the dog multiple times." Ultimately, animal services removed the dog from the home "due to concerns of abuse and neglect." In September 2025, just before trial, the caseworker visited respondent's home and observed "a pretty significant hole in the ceiling" of her living room that was "a third of the size of the ceiling." The caseworker also expressed concerns that respondent was violating her lease by having other individuals stay in the home, which raised concerns about her being able to maintain housing. Thus, the record supports the trial court's finding that respondent could not provide a safe home for DTR and the condition that led to adjudication continued to exist.

Furthermore, the trial court found that other conditions existed—such as respondent's emotional instability and substance use—that would bring DTR under the court's jurisdiction, and those conditions had not been rectified after reasonable notice and opportunity for respondent to address those conditions. The trial court explained that respondent's outbursts, inability to control herself, and escalated behaviors made it unsafe for DTR to be in respondent's care. The trial court noted that unsupervised parenting time had not occurred despite proceedings occurring for nearly two years. The trial court's findings with regard to respondent's emotional instability and its impact on DTR are also supported by the record.

Before DTR's removal, the caseworker observed respondent yelling at walls and cars and carrying on conversations with people who were not there. Throughout the proceedings, respondent received services for her mental health, including a psychological evaluation, medication, and counseling, but her behavior continued to be erratic and, at times, violent. The caseworker repeatedly expressed concerns for respondent's frequent escalations and anger during parenting times, which led to a lack of engagement with DTR. On more than one occasion, respondent used profanity, yelled, screamed, and threw objects during parenting time in front of

DTR. Shortly before trial, respondent's behavior and refusal to return DTR to the DHHS led to DHHS staff calling security and, ultimately, the police.

The caseworker was also concerned that respondent did not recognize her problematic behavior. After being incarcerated for causing property damage while attempting to take a randomized drug screen, respondent simply denied the charges. Further, over the nearly two-year pendency of the case, law enforcement arrested respondent at least eight separate times, including two incidents that took place during parenting time. Respondent also tested positive for methamphetamine, amphetamine, and psychedelic drugs, but was unable to participate in services to address her substance abuse through ISK because she did not indicate having a problem with substance abuse. And near the time of trial, respondent's behavior in leaving a threatening note at the police department and questioning DTR about her foster home raised serious concerns about respondent's mental health and the safety of DTR if returned to respondent's care. Accordingly, the record contains a plethora of evidence that respondent made little progress in addressing her mental health and in fact her behavior worsened over time.

Not only must conditions that bring a child under the court's jurisdiction continue to exist, but MCL 712A.19b(3)(c)(*i*) requires that there be "no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." The determination of what constitutes a reasonable time to rectify conditions includes both consideration of how long it will take a respondent to make improvements and how long the child can wait for the parent to do so. *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991).

At the time the termination trial began, DTR had been removed from respondent's care for almost two years. DTR was two years old at the time of removal and four years old at the time of trial. The trial court heard testimony that DTR's feelings towards parenting time with respondent had changed because of respondent's behavior. The caseworker testified that there "was an incident where [DTR] ran to another area of the library to hide from [respondent]" because of respondent's behavior, and "two or three incidents recently where [DTR] has asked . . . why is mama so mad. Mama, why are you mad?" At the final review hearing, the caseworker testified that [DTR] had started saying that she did not want parenting time with respondent and having "anxiety-like behaviors" surrounding parenting times. In contrast to the clear impact on DTR, there was no evidence that respondent had made progress in addressing her mental health or even recognized her escalated behaviors, such as using profanity in front of DTR, yelling, and screaming during parenting time. Even at the termination trial, respondent interrupted the proceedings with outbursts, laughter, and inappropriate commentary. Accordingly, the record lacked any evidence that respondent had addressed her mental health barriers or would do so in a reasonable time to be able to effectively parent DTR.

Therefore, the trial court did not clearly err by finding that statutory grounds for termination existed under MCL 712A.19b(3)(c)(*i*) and (*ii*) and that respondent would be unable to rectify the conditions that led to adjudication within a reasonable time.

## 2. REASONABLE LIKELIHOOD THAT CHILD WILL BE HARMED

Termination of parental rights is proper under MCL 712A.19b(3)(j) when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be

harmed if he or she is returned to the home of the parent." Harm under MCL 712A.19b(3)(j) includes both emotional and physical harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

The trial court did not clearly err by finding that DTR would be harmed if returned to respondent's care. When making its findings, the trial court relied on the caseworker's testimony that respondent would be fine and then suddenly "blow up," but also explained that it experienced that behavior in the courtroom. The trial court expressed that if respondent "can't control [her] behaviors, [she] can't parent a child." We agree with the trial court that the record is "replete" with examples of respondent's anger, outbursts, and mental health issues "overcoming her ability to parent." Respondent's behavior when she is upset puts DTR at risk of physical injury, like when DTR hit her head on the door as respondent held her and attempted to push past the police officers. Further, there is a concern for DTR's physical safety when respondent storms off and leaves DTR unattended because of an inability to regulate her own emotions. The caseworker also observed respondent hitting her dog and that pet being removed "due to concerns of abuse and neglect in the home," which raises concerns about respondent's parenting ability. In addition to concerns of physical harm, as discussed, the record suggests that DTR has already been negatively impacted by respondent's behavior during parenting time and would likely be even more so impacted if returned to respondent's care.

The trial court did not err by finding that there was no reasonable likelihood that respondent would rectify the barriers to reunification with DTR within a reasonable time, and there was sufficient evidence presented at trial to show that there was a reasonable likelihood that DTR would be harmed if returned to the respondent's home. See *In re BZ*, 264 Mich App at 296-297. Therefore, the trial court did not err by finding that termination of respondent's rights was proper under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j).

## B. BEST INTERESTS

Respondent also argues that the trial court clearly erred by finding that termination of respondent's parental rights was in DTR's best interests. We disagree.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App at 40. "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App at 733. "The focus at the best-interest stage has always been on the child, not the parent." *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022) (quotation marks and citation omitted). "The trial court should weigh all the evidence available to determine the [child's] best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The trial court "may consider the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). The trial court can also consider the length of time that the child has been removed from a parent and the likelihood that "the child could be returned to [the] parent's home within the foreseeable future, if at all." *In re Frey*, 297 Mich App at 248-249.

Respondent argues that the trial court's best-interests analysis was "limited." She argues that the trial court "merely" compared the foster home with respondent's home and simply stated that DTR had been waiting for permanence and was still waiting. We disagree with this characterization of the trial court's findings. The trial court found by a preponderance of the evidence that termination of respondent's parental rights was in DTR's best interests considering the long history of the proceedings and respondent's lack of progress. The trial court made clear that it was not simply comparing respondent's home to the foster home, stating that "[t]he child is in a good place, but it doesn't mean we say, well, it's a better place than the parent—foster parent wins." The trial court explained that its concern was whether the child is safe and whether their needs are being met. The trial court stated that it would return DTR to respondent if it thought there was any progress, but the proceedings had been going on for almost two years and the trial court believed that "we've gone backwards." The trial court found that all the services that could be offered were offered, and respondent did not benefit from those services; therefore, there was no likelihood that DTR could be returned to respondent in the foreseeable future. We agree with the trial court's findings and conclude that the record supports them.

Given DTR's young age, the length of time she had been removed from respondent's care, the lack of progress made by respondent, the bond between DTR and her foster parents, and DTR's need for permanency and stability, the trial court did not clearly err by finding that termination served the children's best interests. See *In re Olive/Metts*, 297 Mich App at 41-42. By the conclusion of the termination trial, DTR was four years old and had been removed from respondent's care for almost two years. The caseworker consistently testified throughout the proceedings that DTR was doing well in her foster-care placement and affirmed that the foster parents were willing to adopt her if the option became available. Further, the foster parents had "a very strong bond" with DTR. In contrast, the trial court heard testimony that DTR's bond with respondent was strained and that DTR no longer wanted to attend parenting times. The foster parents reported that DTR "ha[d] physically displayed not wanting to go to visits with [respondent] by not cooperating with putting shoes on, her backpack on, [or] getting in the car." DTR also had anxious behavior surrounding parenting time, such as trouble sleeping, not eating well, and upset stomachs; however, when respondent was incarcerated and parenting times were not occurring, DTR was "more at peace" and "more comfortable" in the home. As discussed throughout this opinion, it is clear that respondent had not made progress in addressing her mental health barriers to be an effective and safe parent for DTR. Accordingly, the record supports the trial court's finding that termination of respondent's parental rights was in DTR's best interests.

Respondent argues that the trial court should have established a guardianship for DTR, but this argument is without merit. Under MCL 712A.19a(9)(c),

> for a court to consider a guardianship before termination, one of two conditions must be met: either the DHHS must demonstrate . . . that initiating the termination of parental rights to the child is clearly not in the child's best interests or the court must not order the agency to initiate termination proceedings. . . . . [*In re Rippy*, 330 Mich App 350, 359; 948 NW2d 131 (2019) (quotation marks and citations omitted).]

In its petition, the DHHS requested termination of respondent's parental rights. The DHHS did not petition for guardianship, there is no evidence presented in the record that the foster placement would have agreed to such an arrangement, and neither of the conditions precedent under MCL 712A.19a(9)(c) were met. See *id*. at 359-360. Therefore, the trial court did not err by not considering guardianship and finding that termination was in the DTR's best interests.

Affirmed.

/s/ Mariam S. Bazzi
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado